THE STATE OF ALABAMA VS THE MAYOR AND ALDERMEN
OF MOBILE.

5p 279
108    52

5p 279
116    58

Porter.
5p 279
124   166

5p 279
127   328

5p 279
133   473

*Of questions as to nuisance.*
*As to the jurisdiction of equity, in cases of nuisance.*

1. The streets of an incorporated town, are its highways, sub-
ject, *in general*, to such improvement and alteration as its
legislative authority may prescribe,—with a due regard to
individual interest.

2. The extent of the powers of a corporation, is to be ascer-
tained by a reference to such grants as the legislature has
made in its favor.

3. And a corporation can have no rights, except such as are
specially granted; or, as are incidental to, or necessary to
give effect to the powers specially granted.

4. A city corporation would not be authorised to exercise the
right of appropriating streets, or to narrow or widen them,
unless vested with such power, expressly, by its charter,
or in carrying out an *incident* to such express delegation.

5. Any obstruction in a highway or street, tending to the
anoyance of persons living near them, or which renders
the passage through such highway or street, more difficult,
and which thus increases the danger of injury to persons
or property,—would be a nuisance, within the meaning of
the term.

6. At common law, where the matter, arising on an inquiry
as to a nuisance, consists in the obstruction of a highway,—
the question of nuisance, or no nuisance, depends upon the
fact, whether the passage through such highway is ren-
dered less commodious.

7. In this view, the erection of a market house in the center
of a street, the highway of a city, by a city corporation, if
inteferring with a commodious passage through such street,
would be a nuisance.

8. Chancery has the right to exercise its jurisdiction, in the case of a nuisance, in restraining the exercise, or the erection of, and in some instances to abate, that, from which irreparable damage to individuals, or great public injury, will ensue.

9. And this, in the case of a public nuisance, independent of the concurrent jurisdiction of the common law Courts, by indictment.

10. The jurisdiction of Courts of equity, in affording preventive relief in cases of *public nuisances, is clearly defensible*, where the *fact* of nuisance, is placed beyond doubt.

11. And even where the *fact* of nuisance, is questionable, equity sometimes affords relief by way of injunction, (until a trial at law,) where its denial would produce great public inconvenience.

12. The principles which govern a Court of Chancery, in entertaining an information, to restrain the exercise of a public nuisance, or to abate one, are—

First—To prevent irreparable injury from accruing, before a Court of law, can act definitively.

Secondly—*To avoid protracted and expensive litigation.*

13. Where the *city* corporation of Mobile, were vested, by charter, with power to regulate the streets, under certain restrictions,—one of which was, that *government street*, should be and remain one hundred feet in width; and the corporation were proceeding to erect extensive market houses, in the center of that street;—on a bill, in the nature of an information, filed by the State's Solicitor, praying an injunction, whereby the corporation might be restrained, in the erection of such buildings, it was held,—

First—That the expression in the act of incorporation of the city, that *government street* should be one hundred feet wide, was equivalent to a declaration that the street should remain open, of that width, independent of any act to be done by the corporation.

Secondly—That independent of any implication which might arise from the act of incorporation itself, the erection of the market buildings in the center of the street,

was a nuisance—it appearing that thereby, the passage through the street, was incommoded.

Thirdly—That in such a case, Chancery might well entertain a bill in the nature of an information, filed by the State's Counsel, for the object of affording redress.

On a writ of error to the Circuit Court of Mobile county, exercising Chancery jurisdiction.

On the sixth day of April, in the year of our Lord, one thousand eight hundred and thirty-six, a notice, signed by the solicitor of the first judicial Circuit, was issued to the Mayor and Aldermen of the city of Mobile, informing them, that on the ensuing day, a bill, in the nature of an information, would be submitted to the presiding Judge of the Circuit Court, then in session, praying that the said Mayor and Aldermen might be restrained from the erection of certain buildings in Government Street, and also, for the removal of obstructions then existing in said street:—which notice was accompanied by a copy of the bill intended to be filed.

The bill set out, that the solicitor of the first judicial circuit of the State of Alabama, who prosecuted for the State in that behalf, came, and in behalf of the said State, gave the Court to understand and be informed, that for a long time before the first day of January, in the year of our Lord, one thousand, eight hundred and twenty-one, and until the obstruction thereof, therein after mentioned, there had been, and from the time of such obstruction, there ought to have been, and still of right should have been, a certain common and public highway, called and known by the name of Government

5 P.    36

Street, leading from and beyond, to a great distance, the public and common street, known and called by the name of Royal street, in the city of Mobile, in the county of Mobile, down to a certain public and navigable river, called the Mobile river, in said county, for all the citizens in the State of Alabama, to go, return, pass and repass, ride and labor, on foot, and on horse-back, and with their cattle and carriages, at their free will and plea: and that on the first day of January, in the year our Lord, one thousand, eight hundred and thirty-five, at the said county, a certain building and erection, of great length, breadth and height, to wit, of the length of fifty feet, of the breadth of forty feet, and of the height of thirty feet, was, and before had been built, erected and fixed, in, and upon, the said common and ancient highway, called Government street, as aforesaid, between royal street aforesaid, and the said river Mobile,—by the Mayor and Aldermen of the city of Mobile—whereby the said common and ancient highway, was obstructed and stopped up, so that the citizens of the State of Alabama, by the said way, on foot, and on horseback, and with their cattle and carriages, could not then go, pass and re-pass, as they had been accustomed to do; and that the said Mayor and Aldermen, the said building and erection, so as aforesaid, built and erected, in and upon the said common and ancient highway, on the fifth day of April, in the year of our Lord, one thousand eight hundred and thirty-six, at said county, and from the time last aforesaid, until the time of filing the said bill, unlawfully and injuriously did keep, maintain and

continue, and still did keep, maintain and continue: whereby the said common and ancient highway, during the time aforesaid, had been, and was then obstructed and stopped up, so that the citizens of the State of Alabama, during all that time, had been, and then still were, hindered and obstructed in passing and repassing, riding and laboring on foot, and on horse back, and with their cattle and carriages, in, through and along the said common and ancient highway, as aforesaid, to the vast injury of the value of private property, on said Government street, aforesaid, to the great damage of all the good citizens of the State, at large, and against the peace and dignity of the State of Alabama.

And further—that the said Mayor and Aldermen, had adopted a resolution, under which they proposed and intended erecting another obstruction of equal or greater dimensions, than that specially referred to, which was to commence at, or near the west end of said building, then erected, and to continue as aforesaid, and to extend westwardly, to a point, where Royal street aforesaid, crossed the said Government street; which said obstruction thus threatened, and intended to be built, by the said Mayor and Aldermen of the city of Mobile, would further hinder and obstruct the citizens of the State, if erected, in passing and re-passing, riding and laboring, on foot and on horse back, and with their cattle and carriages, in, through and along the said common and ancient highway, called Government street, as aforesaid; and would further lessen and injure, the value of private proper-

ty, along on both sides of said Government street, to an immense amount.

To the end therefore, that the said obstruction, built, erected and continued as aforesaid, being as it was, a public nuisance, might be abated,—the said solicitor, prayed that a decree might be rendered, requiring the said obstruction to be removed, and the nuisance to be abated: and also, that the Mayor and Aldermen of the city of Mobile, might be restrained from erecting and building up the contemplated houses, &c.

This bill was accompanied by the affidavits of Willis Roberts, Henry Stickney, John Soto, Thomas White, William M. Garrow, Samuel H. Garrow and Henry Hitchcock.

The corporation, by attorney, appeared, and without answer or demurrer, contended, that the Court had no jurisdiction. And the bill was dismissed.

*Stewart* and *Thornton* for the State.

Mobile was a city belonging to the kingdom of Spain,—Government street is an ancient highway, and was so, under the Spanish government. The soil belonged to the King of Spain, and was held by him, as *parens patriæ*, for the use and benefit of all his subjects. It was dedicated to the public as a highway, and lots were granted to individuals bordering on this highway; they have therefore, the full right, to its use, and the enjoyment of its full benefits. See 4th Paige Ch. Reports, 510. 6 Peter's R. 431, 438.

By the cession from Spain, the United States acquired all the title and rights of the King of Spain; and by the admission of Alabama into the Union, the State acquired the right to the soil and jurisdiction, and the sovereign control, for the use of the people of Alabama.

The corporation of Mobile, is the creature of the government of the State of Alabama. In Europe, some of the municipal authorities, or city governments, have rights of great antiquity, and of a different nature from any in this State; some are from presciption, and sanctioned by such length of time, that the origin of the right cannot now be inquired into. Some exercise rights, which perhaps, the Crown even cannot now control. (See the history of the municipal powers of boroughs and city corporations—Angell & Ames on corporations.)

' But here, nothing of that kind can be pretended. Spain governed her colonies by military officers,— who represented the King. The government was absolute, and no chartered borough rights existed. When Mobile passed to this government, a change of the mode of government of the city, took place; it received a charter; but it was a written charter of incorporation. No powers were vested in the corporation of Mobile, but those granted, and those incidental to such a grant—all the power the corporation has, is acquired by express grant, or by necessary implication—this power is exercised under the authority of the State government, and is subordinate to it. (See the acts of 1819 and 1820.— Toulmin's Digest Laws of Alabama, 791–792– 786.)

The act of incorporation, under which the corporation claims and exercises its powers, creates a "public corporation." Such corporations are under the control and power of the State government, and differ from private corporations in this,—that the legislature may alter, change, modify and control them at pleasure. The rights of the corporation may be qualified and *abridged*, at any time, by the State authority.—(Angell & Ames 16.

The State authority then, in this case, is paramount, its dictates must be obeyed by the corporation, and cannot be gainsayed, subverted or counteracted by any thing which the corporation can do.

The controversy here, may be considered as between the people of the State at large, of the county of Mobile at large, and of the citizens of the city of Mobile, immediately affected, and whose *rights* are protected, established and declared, by the authority of the State law, on the one part, and claiming their rights under that law, in this proceeding; and of the corporation of Mobile, representing the citizens of Mobile, only, (or rather a majority of them,) on the other part. Government *street is a* public highway, in which all the citizens of the State are interested, and which all have a right to use—that it has been considered so, is evident from the fact, that the State legislature has thought fit to legislate expressly on this subject. This street is the only one in the city of Mobile, which the legislature has been unwilling to place under the control and authority of the corporation of Mobile.

By the act of eighteen hundred and twenty,—[Toulmin's Digest, page 791,]—it is provided ex-

pressly, "that the street called and known by the name of Government street, shall be, and the same is hereby declared to be *one hundred feet wide*, and it shall be the duty of the corporation, to designate and mark out the northern boundary of it &c. &c." Here there is an express declaration, that it shall be appropriated exclusively, for the purposes of a *highway*, by a power of paramount authority, which nothing can defeat. It is to be remarked, that the legislature has, by several acts, given power to the corporation to *widen*, to *extend* and to *lay out new streets*; but in no case is power given to suppress a street, or to make one narrower.—[Toulmin's Digest, 791,–792,–786-]

Then it is the paramount law of the land, that all citizens of the State, of the county of Mobile, and all the citizens of the city of Mobile, who chose to do so, [consisting of the minority, as it may be considered, of the inhabitants of that city,] shall have the right to use Government street, of the width of *one hundred feet*, and every, and any part of it, as a public highway; and this right is secured to them by the highest authority, a statute of the State; and of which the corporation of Mobile, representing a majority of its citizens, cannot deprive them.

But in defiance of this right, and of this express law, the corporation has determined that a portion of that street, shall not be appropriated for use as a public highway, and that it shall not be enjoyed and used as such, but that it shall be appropriated for another purpose, whereby large revenue is raised and paid into the city treasury—and the city

authorities have accordingly erected three large buildings in it, for a purpose entirely unconnected with a highway, and incompatible with its use as such,—thereby diminishing the breadth of one hundred feet, which was declared to be the proper and necessary width, at that place, for passing and repassing, by an authority competent to determine what width was necessary, most expedient and proper, for the public benefit, and for the purposes of a highway. It would seem then, to be a plain question, so far as the right is concerned, that the authority of the corporation must yield to the paramount authority of the State legislature.

The injury complained of then, is, inasmuch as the ground at that place, was declared to be a public highway, that the buildings erected in it, and which prevent the use of the portion of it on which they stand, for the purposes of passing and re-passing,—are a *nuisance.*

The question here arises, what is a nuisance? And is this one? We insist that it is a nuisance, not because it is a *market,* or because a market is *noxious* of itself, for a market, when kept clean, is not of itself a nuisance; but it is a nuisance on account of its location;—it is, because it is in this instance, *"an obstruction to a highway,"* and because it prevents passing and repassing in carriages, carts, &c. at that place, where people have the right to pass. That spot was previously appropriated and used as a highway, and of right; the privilege is now lost, and it cannot any longer be used in that way, although the right to do so, still exists. It is in this point of view, that it is a nuisance.

It is not intended by this to admit that it is not a nuisance, also on account of its being a market. The object of a market is to vend provisions, meat, vegetables, fish, &c.—now to encumber the streets of a city or any part thereof, with goods exposed in the streets for sale, whether in stalls, carts, or without, constitutes a "public nuisance at common law;" and it has been so decided.—[1 Sergeant and Rawle, 217–220.] And it has been further held, that a corporation of a city, by virtue of its general powers, cannot make it lawful to do so—the right to regulate markets does not authorise a nuisance to be erected.—[Ibid.] Even the Crown cannot authorise or sanction that which is a nuisance.—[2 Story's Equity, 202.—Eden on Injunctions, 157,–8.] Nor can the patentee of the King exercise that for which he has a grant from the King, if it be a public nuisance. Then the corporation of Mobile has no power to cause merchandise to be exposed for sale in any of the streets; therefore to erect buildings for that purpose in the streets, and to rent stalls for that purpose, is a nuisance. It is a thing which they cannot do, and cannot license others to do.

But we take a broader ground than this, and may consider this obstruction in the same light as any other public building, which the corporation might think fit to erect in a public street—say a guard house, a public hospital, a poor house, an engine house, a mayors office, town hall, public water works, baths, gardens, burying ground, or any other thing for public use, or to rent out for account of the corporation and from which to raise revenue.

5 P      37.

For all such stand on the same footing precisely. All these things, so far as they are established in Mobile, are built upon property purchased by and belonging to the corporation. Why shall not the market be so located? Why make this distincton? There is none in law—the one is as lawful as the other. Lately, one hundred thousand dollars, or more, have been expended to purchase a scite for a town hall—if a market is equally useful and necessary, a scite can be purchased whereon to locate it.

The building then is an obstruction of a highway, and therefore a nuisance. To obstruct a street or road in any manner is a nuisance.—[Eden on Injunctions, 160, 161. 2 Lord Raymond 858. 6 East R. 427. 3 Campbell, R. 230. 7 Mass. R. 378.

The obstruction complained of, besides being a nuisance, is also a *purpresture*. A purpresture signifies "an inclosure;" and is defined to be, where one "by building, inclosing, or unlawfully using any liberty, encroaches upon a highway, public river, &c. of the King, or of another." The erecting of "a beacon," or making "a causeway there." [7 Comyn's Dig. 178. Co. Litt. 277, b.] Judge *Story* considers a purpresture to be an encroachment upon public property, held by the sovereign for the use of the public, such as highways, rivers, forts, streets and squares." "Where one takes that to himself, which ought to be common to many."—[2 Story's Commentaries on Equity, 201, 202.]

It is then an appropriation of property belonging to the public, by those who have no authority to appropriate it to their use. It makes no difference,

whether it be one or more persons, who claim to appropriate it to their use, whether it be by an individual or by a corporation; the citizens of Mobile have no right to appropriate, to their exclusive profit, that which the citizens of the State, at large, have a right to use as a highway; unless a right to do so can be_shewn, it is an encroachment, and an unlawful encroachment.

This soil belongs to the State as it belonged to the King of Spain. If, however, the property of any citizen had been taken, when it was declared as a highway, one hundred feet wide,—inasmuch as it was the State which so declared it, and not the corporation, the State would have been compelled to pay for any land condemned for that purpose, not the city,—which had not done it. The State can be sued for any injury done by it to an individual. [See Statute.] Then it is the property of the State and of the public at large, and the corporation cannot seize or claim, the control over it or receive the rents and profits of it.

It is therefore, a *purpresture*, and besides, it is a *nuisance*. There are *purprestures* which are no *nuisances*, and there are *nuisances* which are no *purprestures*. But there is a class of grievances which are purprestures and nuisances at the same time, and the one now under consideration is of that class.

It is no answer to say that the whole of the highway is not obstructed. An obstruction to any part of a highway, is a nuisance. [6 Munford's Reports, 308.] In 15 Massachusett's Reports, 240, it is decided, that in an indictment for an obstruction to a

highway, the breadth of the highway need *not* be laid,—it is immaterial—"it is sufficient to aver that the nuisance is on the highway." A partial obstruction is as much a nuisance, as a total obstruction. Indeed almost all the cases, are cases of partial obstructions.

Neither is it an answer to say, that it is for the public benefit. In questions of purpresture simply, where there is no nuisance involved in the case, an inquiry is directed to ascertain whether the building may stand and be rented for the benefit of the King, or public, as being on the public property, or whether it should be abated as injurious to the public. [2 Story's Equity, 202. Eden on Injunctions, 157 to 163;] but where the obstruction is also a *nuisance*, there can be no such inquiry, for it cannot be sanctioned or made lawful. It must be abated. The sovereign power even cannot sanction it, as we have seen. (2 Story's Equity, 205. Eden 158.) In 1 Dallas' Reports, 150, it was ruled that it was no defence against an indictment for a nuisance, to prove that the erection was a matter of public benefit.

For the same reasons we contend that the corporation cannot exempt the building from being a nuisance. They have no power to relieve it from condemnation as such. They were entrusted with the power to "keep streets in repair," "to pass regulations for preserving the same," "to prevent and remove nuisances," "to widen and extend streets." (Toulmin's Digest, 786, 791, 792,) not to obstruct, destroy or diminish streets, nor to erect nuisances, nor to create them instead of preventing them. *No*

such power was ever intended to be given to them by the State. But if it had, the State cannot give the power to erect a nuisance.

Power was given "to regulate and establish markets, and to rent out the stalls in the same;"— but it was not intended thereby to authorise a nuisance. It cannot be so intended. No rule of construction would allow us to imply that an unlawful thing was intended. Power was given to prevent "the selling of meats, poultry, fish, or game, except at the public market or markets." This was for the express purpose of preventing those things from being offered in the street, and of having the streets unencumbered thereby. Power was given to the corporation, "to hold real estate." That was for the purpose of enabling them to purchase grounds to build markets and other public buildings upon. (Toulmin's Digest, 786.)

The grievance being then established to be a "*purpresture and nuisance*," combined, what is the remedy which may be resorted to by those whose rights are infringed, to obtain redress and get rid of it? The answer is, that it is by an information in equity, filed by the attorney general; that the Court will decree a perpetual injunction against it, and decree that it be *abated*. Injunctions lie against corporations, as well as individuals.—1 Russel and Mylne 181. 2 J. Ch. R. 162. 4 Ibid. 53.

The first objection made to this proposition is, that Chancery has no jurisdiction in cases of this kind. But this objection it is believed, cannot be sustained. Chancery takes jurisdiction for the purpose of preventing a multiplicity of suits. For ev-

ery person sustaining an injury, may *maintain* an action, and the determination in one case, does not prevent a continuance of the evil, nor determine the right, except as to the particular party, and for that particular cause of action. Besides, where the public is concerned, a more effectual remedy is necessary, and a trial of the right, where the decision may be effectual. The authorities will clearly shew that the Court of Chancery has jurisdiction in a proceeding like this.

*Story* says, (2 Story's Equity 201.) "In regard to public nuisances, the jurisdiction of Courts of Equity, seems to be of very ancient date." That it is applicable, not only to public nuisances, strictly so called, but also to "purprestures upon public rights." That the remedy is "by an information of intrusion at common law,' or by "an information at the suit of the attorney general in equity," (page 202.) "That informations in equity have been maintained against a public nuisance, by stopping a highway," (page 203.) Also harbors, which are a species of highway, (203.) If the soil belongs to the Crown, the remedy exists for a purpresture—if public nuisance merely, then the information in equity still lies. It lies at the suit of the public, and also at the suit of private parties directly interested." (page 204.)

In relation to private nuisances, the jurisdiction is more restricted. Sometimes it is restricted to cases where irreparable loss and mischief may ensue. But in cases of "public nuisance," such as this is, the jurisdiction is undoubted. In *Eden* on Injunctions, it is said, that "the jurisdiction of Courts of

Equity, in cases of purpresture and nuisance, though not very freqnently exercised, is undoubted." (page 157.) That "the usual mode is to proceed by information at the suit of the Attorney General, but that even this is not necessary, as bills have been sustained without."—(Eden, 163.) And in speaking of cases commented on, says, "that the jurisdiction might have been sustained on the ground of nuisance, although the acts complained of, were not at the same time purprestures." (page, 158.)

In *Maddock's Chancery*, it is said, that "in cases of public nuisance, an information may be filed in the name of the Attorney General," [page 154, 155, 156.] See also Mitford's Equity Pleading, Jeremy's Edition, 145: Which sustains the same positions. These authorities cite, in support of the principle, cases decided a long time ago, and which have always since been relied on, and maintained as authority, and are now so considered.

A case is refered to as opposed to this position. It is the case in 2 Johns. Ch. Reports, 371. That was a proceeding of this kind, filed against the Utica Bank, to restrain them from issuing notes. But that case was decided on the ground, that a statute of New York, gave a plain remedy for the evil, by *quo warranto*—See page 376. Also that the matter complained of was no nuisance.—See page 383. And it was expressly distinguished from cases of purpresture and nuisance. The same Court did take jurisdiction, and restrained even a private nuisance. [2 Johns. Ch. R. 165.] The same principle was also sustained in 5 Johns. Ch. R. 101.—

and 6 Johns. Ch. R. 439. The Court did by injunction restrain a defendant from obstructing a street by building a house in it to the injury of the public, and of the property of the neighbors. There can be no doubt of the jurisdiction of Chancery in this respect.

The next question is as to what the remedy shall be, which the Court shall grant?

In some cases it is said, that the Court will not enjoin till the nuisance has been declared such, by a trial at law. But we insist that this rule has no application to a case like this. Here the relief will be a decree to abate the nuisance, and a perpetual injunction. The cases where a trial at law is necessary, are those where it is doubtful if the nuisance complained of, be one or not. This is particularly applicable to cases of manufactories, affecting health and comfort; "in those cases, injunctions are cautiously granted, and not *exparte*." [Maddock's Ch. 1 vol. 154,–5,–6.] The author there says, "that in cases of private nuisance and of public nuisance, there must be a trial at law." But this clearly applies to the cases above alluded to, for the auther says, "but in cases where there is an encroachment on the Crown, and producing at the same time public injury, the Crown is entitled to the most effectual way to prevent the injury,"— *Eden* lays down the same doctrine. [page 159.] Also Mitford's Pleading, Jeremy's Ed. 201, marginal page 145. *Story* says, "if the purpresture be also a nuisance, it cannot be sanctioned—the Crown cannot sanction it." [2 Story's Equity, 202. It must be abated. [Hardres, 178.]

What would there be at law to try? No question of fact. There can be no doubt—It is not like a manufactory, creating noxious vapor. There the difficulty is, whether nuisance or not—and that is matter of opinion and of doubt. Here it is a question of authority and of right. No public good is to be taken into the account. [1 Dallas R. 150.] If unlawful to put it there, it cannot be sanctioned. It is a bare question of right in law. If the law allows it to be put there, it is no nuisance; if the law does not, it is a nuisance, because it is put there. There is no occasion for a trial at law here. When we decide the right, all is settled. Even in cases of private and uncertain nuisances, relief has been frequently granted without trial at law.—2 Johns. Ch. R. 165.

There can be no inquiry entertained as to whether the market be for the public good or not. That is a question already decided. The legislature representing the people of the State at large, has decided that the public good required that the spot whereon the market stands, shall be used as a highway, and not otherwise. If the corporation of Mobile, representing a small portion of the citizens of the State, are of a different opinion, it is immaterial. The law of the State must prevail, and the Court must consider that as a decided question of policy; no inquiry can be had here as to which would most conduce to the public good. The paramount authority and law, must be enforced, and is binding on this Court.

The question then is, whether the corporation of Mobile, can erect any building they please, for

5 P.      38

their profit and convenience or for public use, whether free or to rent, in any of the public streets of Mobile, and in particular, in Government street. For if they can put the market there, they can put a jail, hospital, or any thing else, by the same right. There can be no distinction drawn. And if they can lawfully obstruct one part of the street, they can another.

It is said that our position cannot be sound, because we maintain that nothing can be put in the streets. That it is unquestionable that lamp posts, wells and well-houses, can be built and put up in the streets. This is admitted, and it is further admitted, that bridges may be built in the streets. [Lamp-posts and wells are expressly authorised by the charter.—Toulmin's Digest, 786.] But these things are appendages to highways, and necessary to them; they facilitate travelling, they are in furtherance of the object of a highway; not in conflict with it. A market is not in furtherance and in aid of travelling. The right cannot be sustained in any point of view.

The owners of property adjoining the market, suffer severely from the nuisance. The south side of Government street, is built up with a row of houses and stores, three and a half stories high, of great value. By a late ordinance, the right of the proprietors, to extend the side walks at that place, to the width of fifteen feet, has been admitted, whereby they are put on a footing with other proprietors on the same street. This has been done, and the side walks are paved with flag stones. That reduces the actual width of the street oppo-

site those houses, to twenty-one feet, seven inches, at one place. This renders access to those stores and houses at all times very difficult, as a carriage cannot turn round in that space; and in market times, when the market carts are stationed all around the market, access with a carriage is absolutely impossible. This the proprietors consider as a great hardship; it diminishes very much the value of their property. And when by a law of the highest authority of the State, they know that they are entitled to a highway in front of their property, one hundered feet wide, they are very restless under the sacrifice of their rights, and will continue so, till the nuisance is abated, and their rights are allowed them.

*Sallee*, contra.

The information alleges that the present market house, is a vast injury to the value of property thereabouts, and a great nuisance to the people of the State, and concludes by praying a decree to abate the present market, and to restrain the erection of another.

The bill is supported by seven affiants, out of a population of nearly or quite ten thousand in the city alone; and not one of the seven swears, that he ever sustained the slightest inconvenience from the market. How the value of property in the neighborhood is vastly injured, there is not the slightest intimation. There is no relator, or certain number of individuals, either of town or country, who come forward to complain, and who might be made liable for costs. But the name of the State is lugged in

for the purpose of giving "pomp and circumstance,' to the case. What then is the real gist of the case? Why, it is, that one or all those affiants, have, Don Quixotte like, made an attack upon the market house. Viewing it then in its real light, let us proceed to examine the cause.

In order to do this, I shall arrange it under the following heads:

First. The corporation in erecting the market house in the street, have either usurped a franchise, or

Secondly. In exercising a lawful franchise, have so demeaned themselves as to injure the private rights of one or more individuals, or

Thirdly. Have erected a nuisance which is injurious to the health of the neighborhood, or

Fourthly. If it be not a nuisance in law, yet it must be so offensive as greatly to disturb the enjoyment of life and of property in the neighborhood.

If the first point be settled in favor of the defendants, the cause is at an end.

The act passed December seventeenth, eighteen hundred and nineteen, (Toulmin's Digest, 784,) incorporating the city of Mobile, gives the Mayor and Aldermen very great powers, both executive, legislative and judicial. Acting within the sphere of their charter, and not contravening, any law of the State or the United States, their power is supreme. The seventh section of the above act, gives them expressly the power to establish and regulate markets, and to rent out the stalls in the same, &c.

The market house then, must either be a purpresture or a nuisance. It cannot be a purpresture, for

a purpresture according to Lord *Coke,* signifies a close or enclosure; that is, where *one,* (an individual as I understand him,) encroacheth or makes that several to himself which ought to be common to many. It is laid down by all the old writers, that it might be committed cither against the King, the Lord of the fee, or any other subject: but in common acceptation, it is at present understood to mean any encroachment upon the King, either upon part of the *demesne* lands, or on high ways, rivers, harbours or streets. Eden on Inj. 157. Again, 2 Chit. Black. 125.—Where there is a house erected, or an enclosure made, upon any part of the King's *demesne,* or on a highway or common street, or public water, it is properly called a purpresture. It is perfectly clear from the above definitions, that the public cannot be guilty of a purpresture: otherwise this very capitol is a purpresture, because erected on public property; and by parity of reasoning, the legislature cannot erect toll gates across public roads. Apply the same principles of reason to the Mayor and Aldermen of the city of Mobile, and it must be clear, it seems, that they cannot be guilty of a purpresture in erecting a market house on the street. It may be readily supposed, that it is by not attending to the distinction, as to what the public may do, and what an individual may not do, that the affiants, complainants, have conceived the market in question to be either a purpresture or nuisance. I have thought it necessary to be thus particular, because every purpresture is, in some sense, a nuisance, but every nuisance is not a purpresture.

Having shewn, as I hope, that this is not a pur-presture, I shall endeavor to shew that it is not a nuisance, at least such a nuisance as gives a Court of Chancery, jurisdiction. This brings me to the second point. Having shewn that the corporation of Mobile, has the power by its charter, to erect a market house,—has it so exercised its right as to invade or infringe the rights of private property? Is it pretended that the present market house, or the one about to be built, is so near another ancient market, as to prejudice it? If not,. the Court cannot interfere upon that ground. [Eden In. 165.]

Is it like the case of *Gardner vs The Trustees of the village of Newburg*? [2 Johns. Ch. R. 162.] Where the trustees acting under an act of the legislature were about to divert an ancient water course, without making compensation? Certainly not. How then does this market house, vastly injure the value of private property? It is not pretended in the bill, that it is either by stopping ancient lights, or by creating offensive smells, or any thing of that kind. In *Eden* on Injunction, 164, it is said, that "it is not every diminution in the value of the premises which affords a ground for the Court to interfere. The foundation of the jurisdiction, is that sort of material injury to the comfort *of the existence* of those who dwell in the neighboring houses, which requires upon equitable principles, the application of a power to prevent, as well as to remedy the evil."

The information in this case, presents no such a case as that of the *Attorney General vs Cleaver*. [18 Ves. 211.] That was an information at the relation of several inhabitants of Battersea and Chelsea, pray-

ing, a perpetual injunction against the defendants restraining them from manufacturing soap or black ash, and from boiling, melting, calcining or burning any of the materials used in manufacturing soap or black ash, in their manufactory in the parish of Battersea; or that they might be restrained *until trial by indictment, in the pleadings mentioned.*

A motion was made for an injunction upon several very strong affidavits, describing the process as both offensive and unwholesome; and stating the effects of the smell from the vapor, even across the river, and further to a considerable distance. Yet the Chancellor, Lord *Eldon,* in that case, refused an injunction, until the fact of nuisance, could be ascertained by the verdict of a jury, upon the trial on an indictment. The cause was afterwards compromised.

The present is not like the case of *Rex vs White & Ward.*—[1 Burr. 333.] In that case the defendents had been convicted of a nuisance in erecting and continuing their works at Twickenham, for making acid, spirit of sulphur, oil of vitriol, and oil of acquafortis. The indictment read thus, viz — "That at the parish of Twickenham, &c. near the King's common highway, there and *near* the dwelling houses of several of the inhabitants, the defendants erected twenty buildings for making noisome, stinking and offensive liquors, and then and there made fires of sea coal and other things, which sent forth abundance of *noisome, offensive* and *stinking* smoke; and made &c. great quantities of *noisome,* offensive and stinking liquors, called, &c. whereby and by reason of which, &c. the air was *impreg-*

·nated *with noisome and offensive stinks and smells*; to the common nuisance of all the King's inhabitants living," &c.   A motion was made in arrest of judgment.   Lord *Mansfield* decided against the motion, declaring that it was not necessary that the smell should be *unwholesome*.   It is enough if it renders the *enjoyment* of life and property, uncomfortable.

It is hoped, I have shewn that by the erection of this market house, neither the right of private property has been invaded, nor the health of the neighborhood affected.   Indeed neither of these is pretended.

The only other point for consideration is, whether the passage of individuals is so obstructed and hindered, as to render the market house a nuisance?   The affidavits do not shew such obstruction.   And if they did, still the question would arise, whether the convenience arising to the inhabitants generally, is not equal, or greater, than the inconvenience arising to a few car-men or other passengers, who may choose to pass that way.

The case of *Rex vs Russell*, [13 Eng. Com. Law Rep. 254.] so completely puts this point at rest, that I shall forbear troubling myself or the Court, with further argument.   I shall conclude with a remark or two, on the jurisdiction of the Court.

In *Attorney General vs Utica Insurance Company*, [2 Johns. Ch. Rep. 378,] Chancellor *Kent* says, "if a charge be of a criminal *nature*, or an offence against the public, and does not touch the *enjoyment* of property, it ought not to be brought within the direct jurisdiction of this Court, which was intended to deal only in matters of civil right, resting

in equity, or where the remedy at law was not sufficiently adequate. Nor ought the process of injunction to be applied, but with the utmost caution." And again, [page 376,] he says, "I have always understood it to be a general principle, in respect to the powers of this Court, that when a cause depends, simply and entirely, on the solution of a, dry legal question, the proper *forum* for the determination of that question, is a Court of law. It appears not to admit of doubt, nor do I understand it to be disputed, that if the defendants, as a corporation, have assumed powers not within their charter, the people of this State, by their Attorney General, have a complete and adequate remedy at law, either by the common law writ of *quo warranto*, or by an information, in nature of such writ."—*Vide.* also 4 Hen. & Munf. 470, to the same point of jurisdiction.

What would be the consequence of this Court entertaining jurisdiction? The prayer of the information, is, "that a decree may be made by this honorable Court, requiring the said obstructions to be removed, and the nuisance abated:" And the Mayor and Aldermen, be restrained from erecting the contemplated additional buildings. What would be the situation of the citizens of Mobile? Nearly ten thousand souls get their daily supplies from this market! Suppose the Court to allow a year to abate in, and permit the marketing to go on during that time as usual, where will the Mayor, &c. go? The public convenience must be consulted in locating the market house. The moment a site is se-

5 P. 39.

lected, some half a dozen individuals may take it into their heads, that they cannot suffer a market house to be erected, "between the wind and their nobility:" And then we shall have another complaint about the "vast injury" to private property, &c. and so on, *toties quoties*, until there shall not be a place in the city where to build a market house. The precedent attempted to be set in this case, is dangerous in its principle. An enterprising individual, with capital, has only to purchase a very large property in the city, determine to force some particular branch of business in that part of the town, the fancy dry goods business, if you please, and forsooth, the humble retail grocer, the son of Vulcan, the sailor's boarding house, the fisherman's huts, &c. all become nuisances, and injure his property in value. This doctrine could be better urged in Constantinople, but can never be admitted in a country of equal rights and of equal laws. If the market house, in this instance, mars the beauty of that part of town in which it is situated, it is a matter that belongs exclusively to the citizens of Mobile.

If the number of small shops that may be on one side of this market, and which are supported by it, render the opposite side, less elligible for fancy dry good stores, that is not a matter for the State of Alabama, its Attorney General, or this Court.

COLLIER, J.—The solicitor of the first Circuit in behalf of the plaintiff in error, filed an information in Equity, in the Circuit Court of Mobile, in which it is alleged that Government street, in that

city, was a public highway, previous to the first day of January, one thousand, eight hundred and twenty-one, subject to be used by all persons as such; yet the same has been greatly obstructed, by the erection of several large houses therein; and that private property on that street, has been greatly injured and depreciated in value, by such erections.

It is further alleged, that the defendants have adopted measures with the view to the erection of another extensive market house, in Government street, which will still further hinder and obstruct its free and uninterrupted passage.

These allegations are sustained by several affidavits, which make part of the record.

The information prays that an *injunction* may issue, to restrain the erection of the market house, threatened and intended to be built. And upon a notice to shew cause, why this prayer should not be granted, counsel appeared before the Circuit Court: when upon full argument, the injunction was denied, and the information dismissed. To revise which decree, a writ of error, has been sued out, returnable to this Court.

In the written arguments with which we have been furnished, this case is supposed to depend mainly upon these questions.

First.—Do the facts, stated in the information, shew a nuisance, either committed or intended?

Second.—Has Equity, jurisdiction over the subject, so as to afford a remedy?

1. By the act of eighteen hundred and twenty, entitled, "An act supplementary to the act, entitled an act to incorporate the city of Mobile"—among

other things, it is enacted, "That the said corpo-
ration shall have power to widen, extend and regulate the streets, lanes and alleys, within the limits
of said city, *provided*, that no street, lane or alley,
now existing, shall be widened, or extended, so as
to infringe upon, or interfere with, any dwelling
houses or other house, in the occupancy of any inhabitant of said city, *without the consent of the*
owner or claimant thereof. And provided moreover, that the street called and known by the name
of Government street, shall, and the same is hereby declared to be, one hundred feet wide; and it
shall be the duty of the said corporation, to designate, and distinctly to mark out, the northern limits
of said street, according as the same were established by the Spanish Government, as nearly as
can be ascertained by the Spanish records, by the
records of the land office, or by any other evidence,
which they may deem satisfactory; and the limits,
when so ascertained, marked out, and designated,
shall be the permanent, northern boundary of said
street." Here an authority is given to the corporation, to regulate the streets, &c. of the city, which
authority is restricted, by an inhibition, that they
shall not be so "widened or extended, as to infringe
upon, or interfere with, any dwelling houses or other
house," &c. "without the consent of the owner," &c.
By the second *proviso*, Government street is declared to be one hundred feet wide, &c. and this is
equivalent to a declaration, that it shall remain open
of that width, notwithstanding any act to be done
by the corporation.

Though all powers which are essential to the in-

ternal police of the city, are granted, by the act of incorporation, and the acts supplementary thereto, the legislature have, in the second *proviso*, declared a standing *veto*, to any act of the corporate authorities, proposing to trench upon the prescribed limits of Government street. If the corporation were to authorise the owners of property on either side of this street, so to improve it, as to diminish the width of the street, no one would question, but that, a power had been exercised which was inhibited by the legislature. And is authority less violated by erecting houses in the centre of a street? In the one case, it would be an unusal, and therefore more striking, violation, promising no public benefit as an equivalent. In the other, the erection of a market house, in a public street, though certainly a great annoyance, to those living contiguous, or having occasion to pass it frequently, is not so palpable a breach of authority, because it is more usual, and offers in return, the semblance, at least, of public convenience.

In either case, it would be an obstruction, which the corporation could not legalise, unless it were permitted to exercise powers, expressly withheld, by the source from which it derived its functions.

The streets of an incorporated town, are its highways, subject, *in general*, to such improvement and alterations, *as its* legislative authority may prescribe; in which a due regard is to be had to individual interests : and sometimes an equivalent rendered for the sacrifice of private property. The extent of the powers of a corporation are to be ascertained by a reference to grants, which the legislature have made

in its favor; for, as an artificial person, *it* can have no rights, except such as are specially granted, or those which are incidental, and necessary to give effect to the powers thus granted.—*The People vs Utica Insurance Company**

An act of incorporation, is an enabling act,—it imparts to the corporate body, all the power it possesses.—*Head & Armory vs The Providence Insurance Company.†* And if the right to appropriate streets, to narrow, or widen them, is not given, either by express delegation, or as an incident, by the legislature, it cannot exercise the power.

In the case before us, the corporation, (as we have seen,) is vested with power to regulate the streets, &c. of the city, under certain restrictions, one of which is, that Government street, shall be one hundred feet wide. The legislature have withheld the right from the corporation, to regulate that street, in disregard of this restriction; any act then, done by the corporate body, which contracts its limits, must be invalid, as an usurpation of authority.

The information charges, that the erections already made, greatly obstruct and stop up Government street, so that it cannot be used as a highway, by persons on foot, on horse back, with carriages, &c. as they had been accustomed, and were authorised to use it. And a diagram accompanying the record, (if it can be considered a part of it,) shews the width of that street, at different points, and the length and width of the market houses erected; from all which, it appears, that the surface uncovered, at several points, was considera-

bly less than one hundred feet, adding together, the open space on either side of the erections.

We incline to the opinion, (though it cannot be necessary to decide the question here,) that the street should present an unobstructed open surface, of one hundred feet in width, and that it is not enough that the space on both sides of an obstruction, should be as much as one hundred feet.

While the streets of a town are its highways, they may also be the public highways of the country. And in the present case, the legislative declaration, prescribing the dimensions of a street, excludes the action of the corporate body, so far as it comes in conflict with the paramount will of the legislature, and must, in itself, be taken to make it a highway, free to the passage of all persons, for all legitimate purposes.

In regard to the first question, it remains but to inquire, whether the obstruction made, as well as that contemplated and intended by the defendants, does or would amount to a nuisance.

*Russell*, in his treaties on crimes,* says, nuisance "signifies any thing that worketh inconvenience." And *Bacon* defines a common nuisance to be an offence against the public, either by doing a thing, which tends to the annoyance of all persons, or by neglecting to do a thing which the common good requires. If we were to take these definitions for our guide, we should have no difficulty in determining, that the obstruction made and intended, come up to the idea of the offence, in a city so populous and so commercial as Mobile.—Do they not tend to the annoyance of persons living near them?

*1 Vol. 295.

And by narrowing a street, render more *difficult its* passage, and increase the danger of injury to persons or property, from collision of carriages and other causes? But we need not deduce our conclusions from general definitions.

*3 Bacon's Ab. 497. *Bacon* in treating of nuisances in highways,* remarks that "it is clearly agreed to be a nuisance to dig a ditch or make a hedge over-thwart the highway, or to erect a new gate, or to lay logs of timber in it, or generally to do any other act, which will render it less *commodious.*" And further, "that it is no excuse for him, who lays logs in the highway, that he laid them only here and there, so that the people might have a passage through them, by windings and turnings."—*Rex vs Watson.*†

†2 Lord Raym. 856
2 Russ. on C. 461. Thus we learn, that at common law, where the particular charge is the obstruction of a highway, the question of nuisance, or no nuisance, *depends* upon the fact, whether its passage is rendered "less commodious." So that we discover in the case before us, the erection made, and that intended, are ,and would be a nuisance.

This view being decisive, we are relieved from considering, whether the act of the legislature does not from implication, make it a nuisance, to make any erections in the street, though the convenience of passing it, may not be interfered with thereby.

2. Touching the jurisdiction of Equity in cases of nuisance, though the cases in which it is exercised are not frequent, yet we think it undoubted. It is founded on the right to restrain the exercise, or the erection of that, from which irreparable damages to individuals or great public injury would ensue.

Speaking upon this subject, Mr Justice *Story* remarks: "In regard to public nuisances, the jurisdiction of Courts of Equity, seems to be of a very ancient date; and has been distinctly traced back to the reign of Queen Elizabeth."* *2Story's Com. 201.

In cases of public nuisances, properly so called, an indictment lies to abate them, and to inflict other punishment upon the offenders. But in England, it was competent also, for the Attorney General to file an information in equity, to redress the grievance. The instances in which that Court has lent its aid, are chiefly confined to informations seeking preventive relief, to inhibit the doing of some act, or performing some work, which when done, would amount to a public nuisance. In these cases the Court proceeds by wayof injunction.† †2 Story's Com. 201.

Informations in Equity have been maintained in 2 Mitford's Plead. 144 some cases, where the object to be effected, exten- Eden on Inj. 157. ded even to the abatement of a public nuisance. In such cases, the jurisdiction of the Courts, is predicated upon the ground, of the ability of Equity to give a more complete, and perfect remedy, than is attainable at law, in order to prevent irreparable mischief, and also, to suppress oppresive and vexatious litigation. "In the first place, they can interpose, where the Courts of law cannot, to restrain and prevent such nuisances, threatened or in progress, as well as to abate those already existing. In the next place, by petpetual injunction, the remedy is made complete, through all future time:— Whereas an information, or indictment, at the common law, can only dispose of the present nuisance; and for future acts, new prosecutions must be

5 P.   40.

.brought. In the next place, the remedial justice may be prompt and immediate, before irreparable mischief is done; whereas at law, nothing can be done, except after trial, and upon the award of judgment."*

*2 Story's Com. 203 & 4.

In an *anonymous case*, (reported in 3 Atkin's R. 750,) a motion was made for an injunction, to stay the building of a house, to inoculate for the small pox,—Lord *Hardwick*, conceding the jurisdiction of Equity, (which was not questioned,) remarks, that bills to restrain nuisances, must extend to such as are nuisances at law; and the fears of mankind, however reasonable, will not create a nuisance,— but inasmuch as it had not been settled, that such an erection created that offence, the injunction was denied.

†18 Ves. Ch. R. 211

In the case of the *Attorney General vs Cleaver*,† there was an information in Equity filed against the defendant, praying an injunction to restrain him from manufacturing certain articles, and from the use of certain materials in the manufacture. Lord *Eldon* did not deny the jurisdiction of the Court, but thought, it proper, to refuse the injunction until it could be ascertained by a trial at law, that the subject of complaint, was a nuisance; and to be in- formed of this, took measures to expedite a trial upon indictment.

‡19 Ves. Ch. R. 617.

In *Crowder vs Tinkler*,† the jurisdiction of Equity by injunction, on the ground that property is likely to sustain irreparable injury, is conceded; and the Lord Chancellor considered the propriety of awar- ding the writ, to depend upon the question, whether upon all the affidavits, or the nature of the subject

complained of, it was so clear that it constituted a nuisance, as to authorise the interposition of the Court, without first putting the case in a course of trial at law.

So in the case of the *Attorney General vs Nichol,** *16 Ves. Ch. R. 338* an information was filed at the relation of the Scottish Hospital against Nichol, to enjoin the obstruction, and darkening of the ancient lights of the Hospital;—an injunction having been granted, its dissolution was afterwards moved before the *Lord Chancellor*, who thought that the jurisdiction of Equity, could not be disputed, notwithstanding the common law remedy, by action or indictment.

In the case of the *Attorney General vs Utica Insurance Company,*† an information in Equity was *12 Johns. C. R. 371.* exhibited against the defendant, charging the company with exercising banking powers and privileges, without authority therefor, and in derogation of law.   The Chancellor was of opinion, that the legal remedy, by information in nature of a *quo warranto,* was adequate to check the operations of the company, if they were unauthorised,—and that, that was a criminal proceeding.   He further determined that the charge was an offence against the public, and could not be brought within the direct jurisdiction of Chancery, which was intended to deal only in matters of civil right, resting in Equity; or where the remedy at law was not complete.— That the process of injunction should be cautiously awarded, with great discretion, and only when necessity requires it.

The Chancellor, after stating that the exercise of the banking power, charged in the information,

does not produce such *imminent and great mischief* to the community, as to call for this summary remedy remarks: "I know that the Court is in the habit of restraining private nuisances to property, and of quieting persons in the enjoyment of private right; but it is an extremely rare case, and may be considered, if it ever happened, as an anomaly, for a Court of Equity to interfere at all, and much less preliminarily, by injunction, to put down a public nuisance, which did not violate the rights of property, but only contravened the general policy."— These remarks were certainly uncalled for, by the decision of the case, for it is there determined that the exercise of the banking power, if it be unlawful, is not a public nuisance. And to the same effect, is the case of the *Attorney General vs The Bank of Niagara.**

*1 Hopkins, Ch. R. 354.

If the Chancellor intended to be understood, according to the literal import of the terms he employs, either he is in error, or else the learned Judges and authors whom we have cited, have mistaken the law, and with all deference for his judgment, we are disposed to think the former most probable.

The jurisdiction of Courts of Equity, in affording preventive relief, in cases of public nuisances, we understand to be clearly defensible, both upon authority and principle, where the fact of nuisance is placed beyond doubt: if this fact be questionable, the aid of that Court is usually withheld ; but even then it has sometimes been given by way of injunction, (to continue until a trial at law,) where

its denial would be productive of great public inconvenience.

The principle upon which Equity entertains an information to restrain the exercise of a public nuisance, (as the employment of an offensive mannfacturing establishment,) or to abate it, has been already stated to be, in the first case, to prevent irreparable injury, before a Court of law could act definitively,—and in the second, to prevent a protracted and expensive litigation, which must generally be the case where there are many persons to defend.

The information in the case at bar, is not as explicit as it should be, in disclosing the difficulties, (if any exist,) to adequate redress at law, so far as it regards the market houses already erected; and though the proof may be ample, it will not be competent to give the relief sought in respect to those, unless the information be so amended as to present upon its face, a good title to the aid of the Court.

That the principles indicated by this opinion, may be carried out, the decree of the Circuit Court must be reversed; and the cause remanded. And an injunction is directed to issue from this Court, according to the prayer of the information, returnable to the Circuit Court of Mobile, to continue, until, in the opinion of that Court, the Equity of the information shall be fully met and removed by the answer and proofs, to come in and be taken in the case. And the costs of this Court, must be paid by the defendants.

GOLDTHWAITE, J. not sitting.