*Court of Common Pleas, Dauphin County, May 16th, 1859.*

THE COMMONWEALTH EX REL. THE ATTORNEY-GENERAL AND
KELKER ET AL. *v.* KEPNER ET AL.

When the person who laid out a town made a deed of the streets to the trustees
for the use of the public, the town council have no authority to erect a
building for a fire-engine house upon any portion of the streets; the fact
that it was in a place not used for travel makes no difference. Such a
building, if erected, would be a nuisance which could be abated, and those
authorizing its construction would be liable to indictment, and probably
would be personally liable for the money so wasted. Before the commence-
ment of the house a bill of equity for an injunction is the proper remedy.
The attorney-general on behalf of the commonwealth and tax-payers whose
lots front on the street opposite the site of the proposed building are the
proper complainants, and the mayor, contractor, and members of the town
council who voted for the erection of the building are the proper respon-
dents. The fact that one of the latter has been omitted will not vitiate the
bill. The borough is not a proper party. A perpetual injunction will
be granted against such borough officers, although they only hold their
offices for a limited period.

BY THE COURT.—The complainants have filed their bill on
the equity side of the court, setting forth that they are resident
citizens on Front Street in the borough of Harrisburg, and own
property and pay taxes in said borough. That Front Street
is a public highway, dedicated to the public for that purpose
forever, and the defendants, Kepner, Muench, Linn, and Black,
members of the town council, and Slentz, a contractor, are
about to erect a brick engine-house for the purpose of accommo-
dating a fire and hook and ladder company on said street, whereby
the public highway will be greatly obstructed and impeded, and
the rights and privileges of the residents on Front Street greatly
injured and impaired. Also that the house, when built, will be a
public nuisance, subject to abatement by law, and will be built by
the expenditure of a large sum of money out of the funds of the
borough to be raised by taxation on the citizens, the orators among
others, and the money so expended will.be.wasted and lost to the
public. The attorney-general, on behalf of the State, joins in the
complaint that a public nuisance is about to be erected on the
highway. To this complaint the members of the town council have
answered in substance, that the act proposed to be done by them
was in their corporate capacity as officers of the borough, that
as such they have the general charge and control of the streets
and alleys; the building proposed to be erected was not for any
private, but for a public beneficial purpose—to hold the fire ap-
paratus belonging to the borough, and they have the right to so
build it if they see proper. That the contract for building the
house was entered into pursuant to a resolution of the board,
which they had a lawful right to pass; such resolution having
the force and effect of a public ordinance, and coming within

their legitimate power as members of the corporation. They also set forth the names of other persons, members of the council, who they aver should be joined with them as defendants in this proceeding. Although the respondents admit that they were about to erect the brick engine-house for the purpose stated, yet they emphatically deny that they were about to erect the same on Front Street, as charged in the bill.

They further aver that, if built, it would not have interfered with or interrupted the plaintiffs, other property-holders, or the people at large from travelling on the streets as they had been accustomed to do. And they also set forth that other public buildings, such as the market-houses, water-house, etc., stand on the public streets without objection. By the evidence introduced on the hearing, it appears that the ground on which the part of Harrisburg, now in controversy, was situated, originally belonged to John Harris, who laid out the town in the year 1785. And for the purpose of securing the streets and alleys to the lot-holders, and certain lots for the use of the public, executed a deed on the 6th day of July, 1785, to Jacob Awl, Joshua Elder, Andrew Stuart, James Cowden, and William Brown, as trustees, " to hold the streets, lanes, and alleys in trust for the public use forever." The streets are generally described by courses and distances, and the one under consideration is mentioned as " the large street along the river-side, called Front Street," begins at " a post marked for a corner, adjoining William McClay's land, at the upper end of town, and of lot No. 80 ; thence extending along the front line of the aforesaid town, south 53° east, 157 perches, to the ferry lot and lane ; thence, south 37° west, to the river Susquehanna, and all the ground and soil thereof from within and between the said line into the aforesaid river." In a bond previously given, referred to in a former part of the same deed, which bond was also in evidence, Mr. Harris speaks of laying out " a large street along the river for public landing-places ;" and the deed also refers to a recorded plat or draft of the town ; but on examining the record referred to, no such draft appears. This deed shows clearly and beyond all cavil that Front Street extends from the front of the lots bordering on it to low-water mark on the Susquehanna river ; and therefore that part of the answer, which denies that the site selected for the erection of the brick engine-house was on Front Street, is incorrect. The spot selected is conceded, and is in front of the house of Mr. Kelker, one of the plaintiffs, and on the level bank of the street. Yet, in coming to this conclusion, we do not believe that there was an intentional misstatement on the part of the reputable gentlemen who swore to the answer ; as they seem to have drawn some imaginary distinction between what they call " Front Street," and what they designate as " the river bank ;" whilst the deed, which is the foundation upon which the street is based, shows

[Commonwealth ex rel. Attorney-General and Kelker et al. *v.* Kepner et al.]

that it extends to low-water mark. Some color, though slight, for the distinction taken by the defendants on the argument is deducible from dotted lines on what purports to be a copy of a plat of the town made out and signed by the heirs of John Harris. But, in the first place, such a draft, made out at an after-time, when many of the lots had been disposed of, could not control the original survey and the deed founded thereon. The lines are of themselves unintelligible, and the map in that particular is not truly copied from the original, which contains no such dots, but shows an open street to the river, as appears by inspection thereof.

We being fully satisfied from the evidence that the site of the building about to be erected is on a part of Front Street, the next question presented is, whether the town council have authority in law to erect the house for the purpose and object set forth in the answer. The only power conferred by the act of Assembly on the town council on this subject is, " improving, repairing, and keeping in order the streets, lanes, alleys, and highways " of the borough. They have no authority to open new ways, widen, contract, or alter old ones, or vacate, abolish, or close up any street, lane, or alley; their duty is confined to improving, repairing, and keeping in order those already laid out, or such as shall be established in the mode prescribed by law. They have, as general conservators of the borough highways, power to regulate pavements, gutters, curbstones, sewers, awning-posts, cellar-doors, shade trees, and such other matters as conduce to the public safety and convenience, to fix the grade of streets, lay down gas or water-pipes, or other improvements of that character. That they have no power to erect any kind of buildings for any purposes whatever on a public highway or street, we think, is very clear both on principle and authority. The erection of market-houses on the streets and public squares of our cities and towns in Pennsylvania is better sanctioned by general usage than that of any other kind of building, and they are probably more conducive to the benefit of the people at large. Yet the Supreme Court of this State in the case of the Philadelphia market-houses declares that, as they were built on a public street, they were a public nuisance, until sanctioned by an act of Assembly; that those who erected and kept them up could have been indicted, and any person might have abated them. The city councils have much more extended powers than any conferred on our borough officers, yet the chief justice of the Supreme Court says that " they were mistaken when they voted that they had full authority to build them in the middle of the street, provided they left a sufficient carriage-way on each side. They could no more obstruct it partially, than close it altogether; and a nuisance erected and maintained by a public corporation in a highway dedicated to the use of the whole people, is as liable to legal punish-

[Commonwealth ex rel. Attorney-General and Kelker et al. *v.* Kepner et al.]

ment, as the same acts done by private parties." The same principle was decided by the Supreme Court of Alabama, on great consideration, as reported in 5 Porter, 279, and spoken of with approbation by our own Supreme Court in the case last referred to. The councils of the city of Mobile, possessed by the charter with more extensive powers than those conferred on our borough officers, were restricted by injunction from erecting a market-house on a street in that city, on the ground that, when built, it would be a public nuisance.

We find strongly analogous principles established in other cases. The commissioners of Bedford county at an early day built their court-house on the public square in the borough of Bedford. A few years since a new one was erected, the old one leased out by the county commissioners to Mr. Bowman for a printing-office, and the county treasurer was permitted to keep his office in a portion of it. The occupants were indicted for keeping up a public nuisance; and the Supreme Court declared that "the county commissioners have no greater right than an individual to disturb the citizen in the enjoyment of a municipal franchise, at least not beyond the bounds of absolute necessity; and the right of even the corporate authorities to erect buildings, from what was said in Rung *v.* Shoneberger (2 W. 24), seems to stand on the same foundation; the public square is as much a highway, as if it were a street; and neither the county nor the public can block it up to the prejudice of the public or an individual; nor can either assert a right to it, by inclosing it beyond the limits of a reasonable curtilage. It is dedicated to the use of the citizens as a highway, and all have a right to pass over it without unreasonable let or hindrance." Although a portion of this building was used as a public office, yet it was declared to be a nuisance, the defendants were convicted and fined for keeping it up, and ordered to abate it. On the erection of the new court-house, it is decided to be the duty of the county commissioners to have the old one removed from the public square. The mayor and council of the city of Allegheny, for the purpose of liquidating a debt contracted in the erection of their water-works, undertook to lay off a portion of a public square in that city into lots, and sold them to individuals, who commenced the erection of a building on one of them. On a bill filed on the equity side of the District Court, it was decided that the city authorities possessed no such power, that the house, if built, would be a public nuisance, and the mayor, council, and builder were restrained by injunction. A learned and elaborate opinion was delivered on the subject by Judge Hepburn, and unanimously confirmed by the Supreme Court (2 H. 186). It is said, *arguendo*, by defendants' counsel in answer to this case, that the building proposed to be erected was not for public, but for the private use of the purchaser. This, in our opinion, makes no

material difference. If the city authorities could occupy the ground themselves, they could authorize it to be done by their vendee, when the sale was made for a public purpose. The maxim would apply there that does in other cases of trust, "a conversion is not a diversion." Although the land is converted into money, yet it is not diverted from its original object, the use of the public. The case is decided on the ground that the square must remain open for the benefit of the people at large, and that it is a franchise belonging to every individual in the community, particularly to the lot-owners, who purchased on the faith of its remaining an open square. We find a similar principle decided in 3 Vermont Rep. 279. Where a square in a town was dedicated to the use of the public as a highway, there is an easement in their favor, and the selectmen of the town cannot authorize buildings upon it, or give an exclusive possession for any purpose. The same principle is repeated with increased force in Abbott *v.* Mills (3 Vert. 521), where it is said that, when an open square is dedicated to the public, and persons have bought and built on the faith of it, the selectmen of the town, even when authorized by an act of Assembly, cannot lease it out for private purposes to the injury or inconvenience of the property-owners around it. It can be appropriated to no use inconsistent with the original dedication. See also 4 Paige's Ch. 510. In all of those cases it is conceded that the streets of a town are more favorably situated for the public than the squares; the former being for the exclusive purpose of travel, it is admitted, must be kept open and unobstructed; whilst the latter, being merely for ornament, and to secure health by more open air, it is contended, can be used by the authorities for useful public buildings; but the distinction is not approved in any of the cases referred to, and is repudiated in Rung *v.* Shoneberger (2 W. 23), The Commonwealth *v.* Alburger et al. (1 Wh. 469), and many other cases. The power of the city authorities over their streets occasioned very considerable discussion in the case of the railroads laid down in the city of New York, where it was ultimately decided by the Court of Appeals, "that the establishment of a railroad is not within the jurisdiction conferred upon the common council over the roads and streets of that city, because it is not an object of the same public nature with those which roads and streets are designed to serve." The right of making such a grant, and of authorizing the construction of a railroad in any of the public streets of the city rests, according to those decisions, with the legislature; and if the railroads had been constructed under the authority of the city ordinance, it is declared that they would have been a public nuisance (Angel on Highways, 22, note).

The same principle, I think, has been universally recognized in our State, as no one has attempted to lay down the track of a railroad on the public street by virtue of an ordinance without the

[Commonwealth ex rel. Attorney-General and Kelker et al. v. Kepner et al.]

authority of an act of Assembly. And yet it must be conceded that the construction of a railroad on a public street would more nearly assimilate to the original purpose of the thoroughfare than the building of a house of any kind, or for any purpose. The one is merely changing the mode of travel, in part, leaving the highway open to all other methods; the other is obstructing it altogether by a permanent erection. The distinction has been taken in several of our books. ·

In one reported case in Pennsylvania (Barter v. The Commonwealth, 3 Penna. 259), it is said "that the title of the corporation to the soil of the street for uses that conduce to the public enjoyment and convenience is *paramount* and *exclusive;*" an expression which would apparently give the borough or city authorities great power over the streets and squares for any and almost every public purpose. But that doctrine was soon after expressly repudiated and overruled by the judge who uttered it in the case of the Trenton and Philadelphia Railroad Company (6 Wh. 45), where it is shown that their duty is merely to keep the streets in proper order for public travel and convenience, and the paramount authority over them resides in the commonwealth. It is now settled in our State, that in all ordinary cases the right of soil in the streets, lanes, and alleys in cities and towns, as well as in the highways in the country, exists in the adjoining proprietors, each owning the soil to the centre of the street, and that it requires express words in the deed to confine them to the margin (Paul v. Carver, 2 Casey, 223). Should that doctrine prevail in the present case, the owners of lots fronting on the river would be entitled to the soil to low water-mark, as has been long since settled in the case of lands fronting on our great navigable waters (1 Wh. 131 ; 2 Wh. 508 ; 5 W. 459 ; 4 Casey, 207). If the adjoining lot-owners are entitled to the soil of the street by virtue of their purchases, with a mere right of passage to the public, as in other cases of highways, we are at a loss to understand on what pretence the town council can take possession of any portion of it to build houses for the benefit of the borough. The grant of the streets of Harrisburg to trustees for the use of the lot-owners may, however, distinguish this from ordinary cases ; but even that could give no additional power to the town council, as the grantees are valid trustees without one particle of interest, and hold the legal title in the soil for the use of every person who bought a lot. The franchises of the lot-holders and of the public in the highways are the same as if no such deed had been executed. The ordinary method of dedicating streets to public use is for the owner of the soil to lay off his town, and exhibit on file a plot of it; and when sales are made of lots with front or rear bounding on a street so laid out, the purchaser has a right to have it thrown open forever (11 Wend. 487 ; 8 Wend. 85 ; 1 Hill, 189, 192). No grantee is

[Commonwealth ex rel. Attorney-General and Kelker et al. *v.* Kepner et al.]

necessary in such case, but the transfer operates by way of estoppel in pais (1 Conn. 106; 6 Peters, 431). And when the dedication is so made, it cannot be resumed either by the person so dedicating or the public (2 Stra. 1004). And the city authorities can apply it to no other purpose than that for which it was dedicated; should they attempt to do so, chancery will enforce the trust (6 Peters, 498; 10 Peters, 662). The defendants further aver in their answer, that even if the house had been built, as proposed, on the public street, it would not interfere with or interrupt the plaintiffs or others from travelling and using the street, as they had been accustomed to do. The reason given for this is that the street is of great width, and there is ample room to pass notwithstanding the house, which was about to be constructed in an unused and out-of-the-way spot. We are clearly of the opinion that none of those reasons are of any avail. If it is conceded that the house is on a public highway, it is a nuisance *per se.*

The owner of property has no more right to obtrude his house one foot on the street, than he has ten feet; and unless on the maxim *de minimis,* he would be as readily convicted of a nuisance. On an indictment for erecting or maintaining a public nuisance, the defendant would not be permitted to show that there was ample room left for the passage. Such evidence would be inadmissible. We are of opinion: 1. That Front Street is a public highway, and extends from the front of the lots, as laid down by John Harris, to low-water mark on the Susquehanna river. 2. That the town council have no authority over it, except for the purposes mentioned in the act of incorporation, or arising out of or deducible from it. 3. They have no power to construct any kind of building on the street for any purpose, public or private. 4. The resolution adopted by the board on that subject was a nullity, was beyond the legitimate authority of the town council, and had no tendency to legalize the act. 5. Had the house been built pursuant to the resolution, it would have been a public nuisance, which could have been lawfully abated by any one; and the town council, which authorized it, and the contractor, who constructed it, would have been subject to indictment.

These are the only points affecting the merits of the case; but there are some questions of form to be considered.

First. Have we proper parties plaintiff to the bill? The commonwealth, through the attorney-general, is a party demanding that a nuisance shall not be erected on a public highway. That is fully sustained by English precedents and those in the courts of the United States; also in our own State in The Commonwealth *v.* Rush (2 H. 186). The three private complainants are residents on Front Street, and two hold property in the immediate vicinity of the proposed building. It is decided in 4 Page's Chancery, 510, " That a person holding property fronting on a square

has such an interest as will enable him to join in a bill for an injunction, whether the proposed erection is in front of his property or not. All the people in a town have an interest in the streets and squares."

The complainants also aver that they are property-holders and tax-payers in the borough. As such we have no doubt that they are interested in the proper and legal expenditure of the public money, and that it shall not be wasted in the erection of a house, which must be removed as a nuisance. In that capacity they are proper parties to the bill. The only objection to that view of the case is that, as the defendants are about to do an unlawful act, not within their authority as borough officers, they might be obliged to pay the expenditure out of their own pockets, and not out of the public treasury. Of the correctness of this position we think there is little doubt; but as there is no tribunal invested with authority to audit, settle, and control their accounts, the present plaintiffs or any other taxable citizen has a right to ask for the intervention of this court, both to prevent an illegal expenditure and unnecessary future litigation. " *Quia timet,*" provided it be reasonable, has always been held to be ground for an equitable interposition. The defendants say that, as they were acting in their corporate capacity as borough officers, the borough of Harrisburg, by its corporate name, should have been made a party; or if the proceeding could be lawfully commenced against the town council, all of the members of the board should have been included; and they furnish the names of the other members in their answer. There is no doubt that the want of proper parties may be suggested and insisted upon in an answer in chancery, and need not be pleaded in abatement, as at law. But in that case the court will bring in the additional parties, provided any of those named are proper. If these gentlemen had confined themselves to the duties confided to them by law, and the act had been one by which they could have bound the borough, we have no doubt but that it should have been made a party by its corporate name. But as they have assumed to themselves a power which the law does not give them, and were about to erect a public nuisance, an indictable misdemeanor, the court no longer considers them as acting under the authority of their commission, but treats them, whether they be officers of a corporation or private individuals, merely as persons acting without lawful authority, as *tortfeasors,* and their act is not binding on the borough; and it would have been improper to have made it a party to the bill. We fully agree to all that is said and to the distinctions taken by the court in Philadelphia, in Hill *v.* The Commissioners (1 Parsons, 501). We consider that it would have been equally improper to have joined any member of the town council, who was not present when the unlawful resolutions were adopted, or acts were agreed to be done,

[Commonwealth ex rel. Attorney-General and Kelker et al. *v.* Kepner et al.]

or if present, were opposed to the action of the board. They were not participants in the unlawful act, and cannot properly be answerable for any of the consequences. The only member of council present who concurred in the action of the defendants was John Cunkle, as appears by the answer. It would have been lawful to have included him, but was it necessary? No one sued at law for committing a trespass, or creating a nuisance, can object that others who have acted with him were not joined. And we are of the opinion that a bill filed in chancery to prevent the waste, or stop the erection of a nuisance, public or private, may include all or any portion of the participants, and there being others not joined is no good ground of objection on the hearing. Were it a case of contract or trust, all the persons interested must be made parties to the bill. In the present case, if the house had been built, and an indictment preferred for a nuisance, it could only with propriety have embraced those who constructed the building, or such as advised, aided, or encouraged the erection. We are of the opinion that the bill embraces proper parties, and to have added any others as defendants, except Mr. Cunkle, would, from aught that appears in the case, have been error.

This is clearly what is considered "*irreparable damage*" in courts of equity, according to adjudicated cases (3 Wh. 512; 2 H. 196), and therefore properly calls for the interposition of the court by injunction. Nor is it one of those cases of doubtful or disputed facts, which justifies a suspension of proceedings by a court of chancery, until the rights are determined by an action at law. There is but one fact disputed in the answer, and that is clearly established by the ancient deed of John Harris and the almost equally ancient draft of the town. It is highly important that the powers and duties of the town council in regard to the streets, lanes, and alleys of the borough should be speedily settled, and the present proceeding is the cheapest and most expeditious that can be adopted. If the defendants had been permitted to proceed and erect the proposed building, it would have been done either at a great loss to themselves or the taxpayers of the borough. We have no doubt that it would have led to indictments for nuisance and the abatement of the structure, and probably to a contest in some form to determine whether the loss should fall on those causing the erection or on the public. No proceeding, either civil or criminal, can be sustained at law until the nuisance is completed. The remedy in chancery is either preventive or corrective. The erection of engine-houses for the preservation of the machinery and the comfort of the firemen is highly beneficial; but they, like all other buildings, must be constructed on lots purchased for the purpose at the public expense, and cannot lawfully be permitted to incumber the streets of the borough. The existence of other structures on

[In the matter of Taylor's Application for the Benefit of the Insolvent Laws.]

our thoroughfares has been urged in the answer as an excuse for the action of the town council in this case; but whether it was lawful or otherwise to build them, we are not called on to decide. We are only bound to declare the law, as we find it settled in relation to the case before us. That part of the answer is entirely irrelevant.

It is urged that we cannot perpetually enjoin these parties, as they are but temporary officers; and, therefore, the proceeding should be against the corporation itself. We do not pretend to enjoin the borough of Harrisburg in this case, but merely the persons who, without proper authority, threaten to do the wrong. Our mandate will perpetually prevent them from doing the injury, and none others threaten it. Should such hereafter be the case, those who consider themselves aggrieved can take legal measures to prevent its recurrence.

We have already said that the act proposed to be done by the defendants is not within their corporate powers; and in attempting to erect a nuisance on the public streets they must be treated as mere wrong-doers, and restrained like all others who threaten an injury to public or private rights. A perpetual injunction must be decreed.

*Briggs and Kunkel, for plaintiff.*

*Fisher, for defendant.*