MAYOR & COUNCIL OF THE CITY OF COLUMBUS *vs.* JAQUES *et al.* MAYOR & COUNCIL OF THE CITY OF COLUMBUS *et al.*, *vs.* OLIVER, Solicitor-General *ex rel.*

1. On a motion to dissolve an injunction, it is error in the Court to tax the defendant upon the refusal of such motion with the whole costs of the proceeding.

2. Any obstruction to a public street in a city, is a public nuisance.

3. A Court of Equity has jurisdiction, and will, in a proper case made by injunction, restrain a public nuisance.

4. The Legislature, 21st December, 1827, authorized certain commissioners to select a site and lay out an oblong square of 1,200 acres as a reservation for the common and town of Columbus, to lay out lots, with appropriate streets, alleys, squares, etc. On 19th December, 1828, the Legislature passed another Act, " That the Intendant and Commissioners shall in no wise have power to alter the plan of said city by shutting up streets or otherwise, nor to permit any dwelling-house or other buildings to be put on any of the streets or common of said town, under any lease or leases, or in any other way:" *Held*, That the Mayor and Council of the city of Columbus, under this restriction, had no power to erect, or cause to be erected, a market-house in the streets of said city.

Mayor and Council of the City of Columbus *vs.* Jaques *et al.*

In Equity, in Muscogee Superior Court. Decisions by Judge WORRILL.

These two cases, relating to the same subject-matter, and involving the same facts and legal questions were argued and decided together.

The object of the bills—one filed by Jaques and others, the other by the Solicitor General, *ex rel*—was to enjoin the City Council of Columbus from the erection of a new market house, in the course of construction, in Oglethorpe street in said city.

Complainants, among other things, allege that they are citizens and tax-payers of the city of Columbus; that said city is largely indebted; that the Council have employed Goetchins & Hodges, contractors, to build a new market-house in said city at heavy cost; that the erection of said market is an obstruction in and to the streets of said city, and is a nuisance, and that the appropriation of money for said purpose violates the 7th section of the Act of 1845, which provides that no order or resolution for the payment of money, etc., exceeding three hundred dollars, except for the ordinary expenses of said city, shall have any force or effect, unless said order or resolution be passed by a majority of the whole board at two successive meetings.

It was upon the ground of a violation of this provision of the Act of 1845 that Judge Worrill granted the injunction in the first named case. To which order, counsel for defendants excepted.

In the second named case, after argument, he granted the injunction, and counsel for defendants excepted, and assigned for error—

1st. That the Court had no jurisdiction.

2d. That the Solicitor General has no power or authority to file said bill.

3d. That the injunction was improperly granted.

JOHN PEABODY, JOHNSON & SLOAN, for plaintiffs in error.

B. A. THORNTON, W. WILLIAMS, BLANDFORD, *contra.*

*By the Court.*—LYON, J., delivering the opinion.

Two bills were filed against the Mayor and City Council of Columbus.

One by the Solicitor General, for the State of Georgia, on the information of a large number of the citizens and tax-payers of the city of Columbus, to enjoin the Mayor and City Council from the erection of a large building for a market-house, with a hall above, to be let for concerts and exhibitions, which they (the City Council) had contracted for, and contemplated erecting in the centre of Oglethorpe street; which is alleged to be one of the most public thoroughfares and commonly used streets in the city, and that such intended building was an obstruction thereof, in violation of the charter of said city, and of the rights of the citizens of said city, and of the citizens of the State of Georgia, to the free and uninterrupted use thereof, for trade, travel, etc., as a public highway. The Court, on a hearing, sanctioned the application, and ordered an injunction to issue. To this decision the Mayor and City Council excepted.

The other bill was filed by the complainants therein, as citizens and tax-payers of the city, alleging the additional ground, that the contract for the erection of said building was void, and ought not to be enforced as against the tax-payers, because it was in violation of 7th section of an Act of 1845, that provides, that no order or resolution for the payment of money exceeding $300 00, except for the ordinary expenses of said city, shall have any force or effect, unless said order or resolution be passed by a majority of the whole Board of the City Council of said city at two successive meetings thereof. The bill alleged that the contract had not been passed by two successive meetings, as required by the Act. This injunction was allowed by the Court, and upon an application to dissolve, the motion was not only refused, but the Mayor and City Council ordered to pay the costs of the whole of the proceeding. This judgment was also excepted to. Subsequently, or perhaps at the same time, the injunction was so far modified as to allow the defendants to go on with their contract or make a new one, provided such contract should subsequently be passed upon and approved by a majority of the whole board at two successive meetings, in terms of the Act. It is conceded the City

Council has subsequently complied with the law, and that the injunction, in consequence, has ceased to be effective. Tho only practical question for our consideration, therefore, is that of the judgment of the Court taxing the defendants in the bill with costs and directing execution to be issued and levied for that purpose.

1. In this there was error. The costs in that behalf, as in all other cases, must abide the result of the final trial of the cause, and so that judgment must be reversed on that ground.

Was the Court right in granting the injunction on the bill filed by the Solicitor-General on the information of the citizens and tax-payers, on the grounds therein alleged?

To understand fully the force of this application, it is necessary to advert to the charter of the City of Columbus, and various additional amendments thereto, by different Acts of the Legislature, in which the lands on which the city is built was granted to the city, and the powers conferred therein— first in Commissioners, and subsequently in the Mayor and City Council. The first Act on the subject was passed on the 24th December, 1827, of which the following is a copy:

## AN ACT

*To lay out a trading town, and to dispose of all the lands reserved for the use of the State near the Coweta Falls on the Chattahoochee River, and to name the same.*—[Assented to Dec. 24, 1827, *Daw. Comp.*, 470.]

[1.] 1. *Be it enacted, etc.* That His Excellency the Governor shall, immediately after the passage of this Act, appoint five commissioners to select the most eligible site, and cause to be laid out and distinctly marked on the reserve aforesaid a town, upon such plan as they may devise and approve, having special regard to the future commercial prosperity of said town and the health of its inhabitants.

[2.] Sec. 2. That said commissioners, in the execution of the duties by this Act assigned them, shall lay out a square or an oblong square fronting the Chattahoochee River of twelve hundred acres, as a reservation for the common and town of Columbus, within which square they shall lay out not less than five hundred building lots of half an acre each, with an appropriate number of streets, alleys, and a suitable

number of reserved squares for public buildings, etc.; secondly, one square within the town and common reserve of ten acres shall be laid out and appropriated to and for the use of the county of Muscogee, as a site for their public buildings, with the privilege of selling so much of the said ten acres as the commissioners of the court-house and jail of said county may deem proper to aid them in building a court-house and jail; but in the event of the commissioners of the court-house and jail selecting some other site than the town of Columbus for their public buildings, then and in that case the aforesaid lot of ten acres shall revert to, and become again vested in the State.

[3.] Sec. 10. That the said town shall be called and known by the name of Columbus.

Under this Act, it seems that the commissioners therein named laid off the city of Columbus into streets, lots, squares, etc., as they were authorized to do, and as they exist at this day. On the 19th December, 1828, the Legislature passed another Act, of which the following is a copy:

## AN ACT

*To incorporate the town of Columbus, in the county of Muscogee, and to provide for the election of an Intendant and Commissioners for the same.*—[Assented to 19th December, 1828, *Daw. Comp.*, 474.]

[4.] Sec. 3. *And be it further enacted, etc.* That the Intendant and Commissioners shall in no wise have power to alter the plan of said town by shutting up streets or otherwise, nor to permit any dwelling-house or other buildings to be put on any of the streets or common of said town under any lease or leases, or in any other way.

[5.] Sec. 4. That the Intendant and Commissioners of said town shall have power to lease the common and other property of the town for any term not exceeding three years at any one time.

[6.] Sec. 5. That the Intendant and Commissioners shall have power to pull down and destroy, as a nuisance, all obstructions in the streets of said town, and all dwelling and other houses on the common and unsold lots within the cor-

porate limits of said town, which shall embrace the town and common belonging thereto.

On the 21st December, 1831, the Legislature, by Act, authorized the Intendant and Commissioners of Columbus, and their successors in office, "to lay off and lease any lots in said town, below Thomas street, for the purpose of building wharves only, for any number of years, as they may think proper, not exceeding twenty, for the use and benefit of said town." By an Act of 23d December, 1835, "The election of a Mayor, in lieu of the Intendant and six members, (which number, by an Act of December 25th, 1845, was increased to twelve Aldermen), of the City Council, to be known as the Mayor and Council of the city of Columbus," with power, by sec. 12, "to pass all by-laws necessary for the government of said town which do not conflict with the Constitution and laws of the State of Georgia, and of the United States, reference to which alone shall be had in the adjudications upon this Act." By an Act of December 25th, 1837, "The Mayor and Councilmen of the city of Columbus are authorized to lease all of the south commons, or so much thereof as may be necessary for the purpose for which they are now used, for the term of twenty years, at such rates as they may deem necessary to the interest of said city of Columbus." Again, in December 22d, 1840, "the Mayor and Council of the city of Columbus may, and thereby were authorized to define Bay street in said city, and to limit its width to one hundred feet; and to lay off water lots up and along the western boundary line of said street, and on the north common of said city, beginning," etc; and by the second section, "to dispose of said water lots by lease or sale for such time and on such terms as they may deem best for the interest of said city, and to execute titles to the same."

These are all the different enactments, or legislative provisions, on the subject to which our attention has been directed, or which we deem necessary to notice.

The questions that present themselves to our consideration are—

1. Whether the facts constitute a public nuisance?

2. Whether injunction is a proper remedy, or whether it will lie in such case?

3. Whether the City Council of Columbus have, by their charter and subsequent legislation, such control over the

streets as enable them to erect the building for the purposes contemplated ?

The nuisance here complained of is of a particular kind, termed, in the books, a *purpresture*, which signifies a close, or enclosure; that is, when one encroacheth and makes that serviceable to himself which belongs to many. " And because it is properly, when there is a house builded or an inclosure made of any part of the King's demesne, or of a highway, or a common street, or public water, or such like things, it is derived of the French word *pourpris*, which signifies an inclosure; but specially applied as is aforesaid, by the common law :" *Coke on Lit.*, 3 *Vol.*, 4 *Waterman's; Eden on Inj.*, 259. " There is no doubt but that all injuries whatsoever, to a highway, as by digging a ditch or making a hedge across it, or laying logs of timber in it, or by doing any other act which will render it less commodious to the King's subjects, are public nuisances at common law :" 1 *Russ. on Cr.*, 346. " Any contracting or narrowing of the highway is a nuisance: *Ibid.*, 349. It is said that notwithstanding the erection of this building, the public will not be inconvenienced, for there will be sufficient space on either side of the building for the passage of the public. The answer to this is, that the public have the right to the unobstructed use of the whole street, just as it was wont to run, or as it has been dedicated to its use. In other words, to apply the principle to this case, the public has the right to the use of this entire street just as it was laid off by the commissioners under the Act of 1827, and any obstruction or encroachment on the same is a nuisance.

3. The next question is, whether equity has jurisdiction or can afford relief by injunction? It is claimed that no such jurisdiction exists, because the remedy at common law is adequate and complete by indictment, etc. The authorities leave us no room to doubt, but that equity has jurisdiction, and can, by injunction, give relief. If there was any doubt as to whether the Act complained of was a nuisance, we would not, in a case of the importance of this, interfere by injunction; but there is no doubt of that fact; it is a plain fact—is admitted by the answer. We are aware that Chancellor Kent, in the *Att'y Gen'l vs. The Utica Insurance Co.*, 2 *Johnson's Ch.*, 370, refused an injunction against certain persons for carrying on the business of banking in

violation of an Act of the State of New York; and in that case, while he admitted that there was a precedent for equitable interference in cases of this kind, he very gravely doubted whether the Court properly had the jurisdiction. But *Eden on Injunc.*, 259, lays down the rule broadly, "that the remedy for this species of injury, is by information of intrusion at common law, or by information at the suit of the Attorney General in Equity." *Att'y Gen'l vs. Richards*, 2 *Aus.*, 603; *The Mayor of London vs. Bolt*, 5 *Ves.*, 129. The ground of this jurisdiction of Courts of Equity, in cases of *purpresture*, as well as of public nuisance, undoubtedly is, their ability to give a more complete and perfect remedy than is attainable at law, in order to prevent irreparable mischief, and also to suppress oppressive and vexatious litigations. *Story's Equity*, sec. 924; see also secs. 921, 2-3-5. In addition to the reasons stated by Judge Story, in sec. 924, why the remedy at common law by indictment would not be complete in this particular case, I will state here one or two other reasons: This indictment would necessarily be against the city officers, or those who act under them, and in all probability the influence and moral integrity of these gentlemen, which would necessarily be brought to bear against a criminal proceeding, would more than likely protect them from a conviction as criminals. Besides, if the nuisance be erected and they should have to be abated as such, the whole loss would fall on the tax-payers of the corporation, and therefore the interference of a Court of Equity is in the highest degree necessary to prevent this outlay and loss of the money in which all have a common interest. This identical question was before the Supreme Court of Alabama, in the *State vs. The Mayor and Aldermen of Mobile*, 5 *Porter*, 279. That was a proceeding like this, to restrain the Mayor and Alderman of the city of Mobile from the erection of an extensive market-house in Government street, which would hinder and obstruct its free and uniterrupted passage. By a statute of the State of Alabama, passed in 1820, supplementary to the Act, to incorporate the city of Mobile, authorizing the corporation "to widen, extend and regulate the streets, lanes and alleys in said city, etc. And provided, moreover, that the street known as Government street shall, and the same is hereby declared to be one hundred feet wide." "This," the Court says, "is equivalent to a declaration, that

it shall remain open of that width, notwithstanding any act to be done by the corporation." " The corporation is vested with power ·to regulate the streets, etc., of the city under certain restrictions, one of which is, that Government street shall be one hundred feet wide. The Legislature have withheld the right from the corporation to regulate that street, in disregard of this restriction. Any act, then, done by the corporate body which contracts its limitations must be invalid, as a usurpation of authority." The legislative declaration, prescribing the dimensions of a street, excludes the action of the corporate body, so far as it comes in conflict with the paramount will of the Legislature, and it must in itself be taken to make it a highway, free to the passage of all persons, for all legitimate purposes. " Touching the jurisdiction of Equity in case of nuisance, though the cases in which it is exercised are not frequent, yet, we think it undoubted." If this legislative provision was so restrictive upon the power of the corporation of Mobile to interfere with, obstruct or impede the free and uninterrupted use of Government street, as a public highway, how much more so is the legislative restrictions of the Act of 19th December, 1828, upon the City Council ׀ of the city of Columbus: " That the Intendant and Commissioners shall in no wise have power to alter the plan of said town, by shutting up streets or otherwise, nor to permit any dwelling-house or *other buildings to be put* upon any of the streets or common of said town under any lease or any other way."

4. And this brings me to the consideration of the last question, and that is, whether the City Council of Columbus, under the general grant to pass such by-laws as are necessary for the government of said city, or from some other Acts to which I have referred, do not take the power either directly or by implication to regulate and control the streets of the city as they think proper? And we are clear that they have no such power—no power to obstruct the streets of said city by the erection of any building, no matter how essential and important they may deem the erection of such building for the benefit and welfare of the city or its citizens. Upon this subject there is no room left for them to judge. The legislative prohibition is too plain and unqualified. · The Act of 26th December, 1831, to lay off and lease lots in the town below Thomas street, for wharves; that of 25th December,

1837, authorizing a lease of the South commons, and that of 22d December, 1840, authorizing the City Council to define Bay street and to limit its width to one hundred feet, all taken together or singly, instead of showing that the City Council might exercise such power, plainly negative any such idea. If the City Council had the power, why these Acts? Then, holding with the Court below, that the erection of this market building would be such a public nuisance as a Court of Equity will and ought to relieve against, and that the act is an usurpation of power by the City Council expressly prohibited by the second Act of the Legislature which I have cited, we are compelled to affirm the judgment.