ALBANY THEATRE INC. *et al. v.* SHORT, solicitor-general, *et al.*

No. 7566.   JULY 18, 1930.   REHEARING DENIED SEPTEMBER 13, 1930.

*Bennet & Peacock,* for plaintiffs in error.

*R. B. Short, solicitor-general, E. L. Smith,* and *S. B. Lippitt,* contra.

HILL, J. (After stating the foregoing facts.)

The Penal Code (1910), § 416, provides as follows: "Any person who shall pursue his business, or the work of his ordinary calling, on the Lord's day, works of necessity or charity only excepted, shall be guilty of a misdemeanor." It is insisted by plaintiffs in error that a court of equity has no jurisdiction to enjoin the defendants from operating the picture-show on Sundays, under the allegations of the petition, under the foregoing section of the Penal Code of this State; and learned counsel for plaintiffs in error have filed a very able and exhaustive brief, and supplemental brief, in

favor of their contention. These briefs have been read, and the authorities cited have been examined with a great deal of patience and care, owing to the importance of the question involved. After doing so, I am unable to bring myself to agree with the conclusions reached by learned counsel for plaintiffs in error. The general subject of a violation of the foregoing section of the Penal Code has been so elaborately and ably discussed by learned members of this court that I shall quote at some length from the decisions rendered by them, inasmuch as they, in our opinion, bear directly on the question at issue. And first, in the case of *Hennington* v. *State,* 90 *Ga.* 396 (17 S. E. 1009), Chief Justice Bleckley has very ably and convincingly discussed the necessity of the observance of a day of rest—one day out of each week. He said, in part:

"If the sanction of time can ever be invoked to justify the exercise of governmental authority over a particular subject-matter, this can certainly be done in respect to setting aside one day in each week for rest and the cessation of all unnecessary labor. A law to this effect prevailed in the earliest times of which we have any authentic record, and the subject was one of statutory regulation in Georgia during her colonial period, and has so continued throughout the whole term of her existence as a State. At no instant since her independence was declared has she been without such a law on her statute book. It is not only unlawful, but penal, for any person whatsoever to 'pursue their business or work of their ordinary calling upon the Lord's day, works of necessity or charity only excepted.' . . This prohibition upon Sunday labor was already in force when the Code was adopted, and dates back to the year 1762. The penalty prescribed by the colonial statute has been changed, but in other respects that statute has been operative continuously since it was enacted. There can be no well-founded doubt of its being a police regulation, considering it merely as ordaining the cessation of ordinary labor and business during one day in every week; for the frequent and total suspension of the toils, cares, and strain of mind or muscle, incident to pursuing an occupation or common employment, is beneficial to every individual, and incidentally to the community at large,—the general public. Leisure is no less essential than labor to the well-being of man. Short intervals of leisure at stated periods reduce wear and tear, promote health, favor cleanliness, encourage social intercourse, afford op-

portunity for introspection and retrospection, and tend in a high degree to expand the thoughts and sympathies of people, enlarge their information, and elevate their morals. They learn how to be, and come to realize that being is quite as important as doing. Without frequent leisure, the process of forming character could only be begun; it could never advance or be completed. People would be mere machines of labor or business—nothing more.

"If a law which, in essential respects, betters for all the people the conditions, sanitary, social, and individual, under which their daily life is carried on, and which contributes to insure for each, even against his own will, his minimum allowance of leisure, can not be rightly classed as a police regulation, it would be difficult to imagine any law that could. With respect to the selection of the particular day in each week which has been set apart by our statute as the rest day of the people, religious views and feelings may have had a controlling influence. We doubt not they did have, and it is probable that the same views and feelings had a very powerful influence in dictating the policy of setting apart any day whatever as a day of enforced rest. But neither of these considerations is destructive of the police nature and character of the statute. If good and sufficient police reasons underlie it, and substantial police purposes are involved in its provisions, these reasons and purposes constitute its civil and legal justification, whether they were or not the direct and immediate motives which induced its passage, and have for so long a time kept it in force. Courts are not concerned with the mere beliefs and sentiments of legislators, or with the motives which influence them in enacting laws which are within legislative competency. That which is properly made a civil duty by statute is none the less so because it is also a real or supposed religious obligation; nor is the statute vitiated, or in any wise weakened, by the chance, or even the certainty, that in passing it the legislative mind was swayed by the religious, rather than by the civil, aspect of the measure. Doubtless, it is a religious duty to pay debts, but no one supposes that this is any obstacle to its being exacted as a civil duty. With few exceptions, the same may be said of the whole catalogue of duties specified in the ten commandments. Those of them which are purely and exclusively religious in their nature can not be or be made civil duties, but all the rest of them may be, in so far as they involve conduct as distinguished from

mere operations of mind or states of the affections. Opinions may differ, and they really do differ, as to whether abstaining from labor on Sunday is a religious duty; but, whether it is or not, it is certain that the legislature of Georgia has prescribed it as a civil duty. The statute can fairly and rationally be treated as a legitimate police regulation, and, thus treated, it is a valid law. There is a wide difference between keeping a day holy as a religious observance and merely forbearing to labor on that day in one's ordinary vocation or business pursuit. . .

"It applies alike to all business, vocations, and occupations. It concerns the general police of the State and all interests, whether agricultural, mechanical, manufacturing, commercial, professional, or what not. It is universal, and rigidly impartial, making no discrimination whatever for or against commerce or anything else. It puts no obstacle in the way of trade or its operations which is not encountered by every other class of wordly business or employment. Non-trading days are non-business days generally, and non-working days for all the people. Trade may go on when anything else can; it stops only when, and so long as, there is a complete suspension of worldly enterprise and activity. It is required to take no rest which is not appointed for everything else to take."

This same case was reviewed by the Supreme Court of the United States; and that court, speaking through Mr. Justice Harlan, quoted from the decision of Chief Justice Bleckley, and in Hennington v. State of Georgia, 163 U. S. 300 (16 Sup. Ct. 1086, 1087, 41 L. Ed. 166, 168), he said: "From the earliest period in the history of Georgia it has been the policy of that State, as it was the policy of many of the original States, to prohibit all persons, under penalties, from using the Sabbath as a day of labor and for pursuing their ordinary callings. By an act of the colonial legislature of Georgia, approved March 4, 1762, it was provided: 'No tradesman, artificer, workman, laborer, or other person whatsoever shall do or exercise any worldly labor, business, or work of their ordinary callings, upon the Lord's day, or any part thereof (works of necessity or charity only excepted), and that every person being of the age of fifteen years or upwards, offending in the premises, shall, for every such offense, forfeit the sum of ten shillings. And that no person or persons whatsoever shall publicly cry, show forth, or expose to sale any wares, merchandise, fruit, herbs, goods, or

chattels whatsoever upon the Lord's day, or any part thereof, upon pain that every person so offending shall forfeit the same .goods so cried or showed forth, or exposed to sale, or pay ten shillings.' . . . In our opinion, there is nothing in the legislation in question which suggests that it was enacted with the purpose to regulate interstate commerce, or with any other purpose than to prescribe a rule of civil duty for all who, on the Sabbath day, are within the territorial jurisdiction of the State. It is none the less a civil regulation because the day on which the running of freight-trains is prohibited is kept by many under a sense of religious duty. The legislature having, as will not be disputed, power to enact laws to promote the order and to secure the comfort, happiness, and health of the people, it was within its discretion to fix the day when all labor, within the limits of the State, works of necessity and charity excepted, should cease. It is not for the judiciary to say that the wrong day was fixed, much less that the legislature erred when it assumed that the best interests of all required that one day in seven should be kept for the purposes of rest from ordinary labor. The fundamental law of the State committed these matters to the determination of the legislature. If the lawmaking power errs in such matters, its responsibility is to the electors, and not to the judicial branch of the government. The whole theory of our government, Federal and State, is hostile to the idea that questions of legislative authority may depend upon expediency, or upon opinions of judges as to the wisdom or want of wisdom in the enactment of laws under powers clearly conferred upon the legislature. The legislature of Georgia no doubt acted upon the view that the keeping of one day in seven for rest and relaxation was 'of admirable service to a State considered merely as a civil institution.' 4 Bl. Com. 63. The same view was expressed by Mr. Justice Field in Ex parte Newman, 9 Cal. 502, 520, 529, when, referring to a statute of California relating to the Sabbath day, he said: 'Its requirement is a cessation of labor. In its enactment, the legislature has given the sanction of law to a rule of conduct which the entire civilized world recognizes as essential to the physical and moral well-being of society. Upon no subject is there such a con· currence of opinion, among philosophers, moralists, and statesmen of all nations, as on the necessity of periodical cessation of labor. One day in seven is the rule, founded in experience and sustained by

science. . . The prohibition of secular business on Sunday is advocated on the ground that by it the general welfare is advanced, labor protected, and the moral and physical well-being of society is promoted.' "

In Bloom *v.* Richards, 2 Ohio St. 387, 391, Judge Thurman, delivering the unanimous opinion of the court, said: "We are, then, to regard the statute under consideration as a mere municipal or police regulation, whose validity is neither strengthened nor weakened by the fact that the day of rest it enjoins is the Sabbath day. Wisdom requires that men should refrain from labor at least one day in seven, and the advantages of having the day of rest fixed, and so fixed as to happen at regularly recurring intervals, are too obvious to be overlooked. It was within the constitutional competency of the General Assembly to require the cessation of labor, and to name the day of rest."

In *Weldon* v. *Colquitt,* 62 *Ga.* 449, 451 (35 Am. R. 128), this court, in holding that a court of inquiry held on Sunday is illegal, speaking through Judge Bleckley, said: "In Georgia, as in England, Sunday is a holy day. The code denominates it the Lord's day, and as the Lord's day all courts and magistrates are to consider it. This they are to do as matter of mere law, irrespective of religious obligation and duty. On it there can be performed no judicial labor which does not come fairly within the description of works of necessity or charity. Sunday is no day for trial and judgment, being, by the common law, dies non juridicus. The mere act of receiving a verdict on Sunday, which a jury are ready to deliver, is illegal. 49 *Ga.* 436. The current of decision by this court has been prosabbatic in full measure, and with that current runs, we think, the true law, as well as the general moral sentiment of the people of the State. Courts, high or low, are no less bound to abstain from ordinary labor on the Sabbath day, than are private individuals. In a time of peace, and when the magistrates of the country are not overwhelmed with police business, to an extent rendering it impracticable to dispatch the same without encroaching upon the Sabbath, a court of inquiry can not be begun and held on Sunday for the examination and commitment of offenders, not even of Sabbath-breakers, rioters, or disturbers of public worship. Warrants may issue and arrests be made, but examination and trial can not be commenced until Monday. In the record before

us there is no trace of any necessity, physical or moral, which made it incumbent upon the magistrate to disregard the legal restraints appertaining to the Sabbath, and engage in the exercise of judicial functions on that day. Doubtless he supposed himself to be in the line of duty, but he was mistaken. All he did judicially in the premises was absolutely void; and in strict law, he was himself amenable to the penalties of section 4579 of the Code, as the violator of the Sabbath day, the holding of courts of inquiry being a part of his ordinary calling as a judicial officer."

Chief Judge Hill, in the case of *McCain* v. *State, 2 Ga. App.* 389, 390 (58 S. E. 550), discusses the Sunday law at length, and says: "The terms of the statute are very broad. They not only forbid the pursuit of secular business, but forbid any work of ordinary calling on the Lord's day, except works of necessity or charity. It makes no sort of difference that the secular business is not carried on on Sunday at the usual place of business. If the work is that of his ordinary calling, and is occasionally performed by the defendant at a different place, he violates the statute. The law not only closes the business places of secular employment during the Sabbath, but stops on said day work of ordinary calling, whatever that work may be or wherever that work may be done. The purpose of the law is to require cessation from labor, and to set apart one day as a day of rest as essential to the physical and moral well-being, not only of the individual, but of society. It can not be doubted that the plaintiff in error in shaving his customers at the rooms of the club did pursue the work of his ordinary calling. It was simply a change of location, but the work was the same as pursued on week days at his place of business. Neither can it be doubted that this work was done by him because of the compensation paid by the members. The fact that the work in question was confined to the members of the club, and was performed in the clubhouse, may reduce the flagrancy of the offense, but can not alter the express terms of the law. The work on Sundays was possibly not so active and constant as the defendant's work on week days. Still, shaving was the work of his ordinary calling. 'Those things that are repeated daily or weekly in the course of trade or business are parts of the ordinary calling of the man exercising such trade or business.' *Reed* v. *State, 119 Ga.* 563 (46 S. E. 837)."

The record in this case discloses that the *defendants,* including the regular employees of the Albany Theatre, were engaged on certain Sundays in the same kind of business and in the same employment, doing the same kind of work of their ordinary calling that they had previously done six days preceding Sunday performances, and such work was of their ordinary calling, and because that work was being performed for somebody else for the same pay, at the same place, and under the same circumstances, would not change it from work of their ordinary calling, and I think that such work would constitute a violation of the Penal Code, § 416. The work performed by the various employees of the defendant theater on Sundays is admitted in their answer to be the same kind of work done on week days. Whether that work was done by the usher, the ticket-seller, or the operator of the picture-machine, in the same place of business, it was a continuation of their daily work. I am of the opinion that it was the purpose of those who enacted the law to require the cessation from labor and set apart one day in seven as a day of rest, and that this cessation from labor was and is essential to the physical and moral well-being of individuals and of society. But the evidence here tends to show that the defendants continued to work on Sunday, collect the proceeds from the picture-show, and, after the payment of the various employees, the contract prices for the films, advertising, and all other expenses, that the balance was paid to those in whose interest the theater was being operated. Under the terms of the statute quoted above, it would make no difference whether the proceeds from these Sunday shows was given to charity or not. The law does not mention the question of proceeds. Clearly the work being performed by the defendants is not one of *necessity,* and the work done is not *charity,* because they are receiving pay therefor. The employees are paid their regular wages, and the evidence tends to show that there is no cessation from labor by them from the beginning to the end of the week as contemplated by the statute. The employees have no day of rest, which the law contemplates is essential to the *physical and moral well-being* of the individual who engages in it, as well as of society. And by these acts the very purpose of the law, and the reason and the spirit of it, is destroyed by those who pursue their ordinary daily business on the Sabbath day. In the case of *Penniston* v. *City of Newnan,* 117 *Ga.* 700(2) (45 S. E. 65),

this court, speaking through Mr. Justice Cobb, discussed the Sabbath day, and held that the sale of drugs on Sunday, unless there was a necessity to do so, was a violation of the law. And in *Arnheiter* v. *State,* 115 *Ga.* 572 (41 S. E. 989, 58 L. R. A. 392), it was held that "It is not, within the meaning of section 422 [now section 416 Penal Code 1910] of the Penal Code, a work of 'necessity or charity' for a butcher to sell meats to his customers on the Lord's day merely because they choose, as matter of convenience or preference, not to make their purchases on the previous day." In *Reed* v. *State,* 119 *Ga.* 562 (46 S. E. 837), it was held that: "Where a person having several different occupations works at one on the Sabbath day, he is guilty of violating the Penal Code, § 422, even though that particular business does not occupy most of his time on the other days of the week." If the work of operating a theater on Sunday for the purposes alleged in the present case is done as a work of charity, why not designate a week day for such work? But the evidence in the instant case does not show that the employees, either on week days or on Sundays, give anything to charity; all of them receive the same pay on Sundays that they do on week days for their work. The pro rata contractual price agreed to be paid by the theater for the reel is paid by the American Legion, and the theater advertises the operation of its business both week days and Sunday, and a portion of this is paid by the Legion, and thus all of the defendants are participating in one way or another, by operating the picture-shows, thus violating section of the Penal Code § 416. The case of *Williams* v. *State,* 167 *Ga.* 160 (144 S. E. 745, 746, 60 A. L. R. 747), is cited by counsel for plaintiff in error. In that case this court held that the sale of gasoline to be used in automobiles on the Sabbath was "a work of necessity," but that case is not in point. It can not be seriously contended that a moving-picture show operated on Sunday is a work of necessity.

■ The next question to be considered is whether, under the circumstances of the present case, the operation of a theater, and showing moving-pictures on the Sabbath day *continuously,* constitutes a *public nuisance,* and whether a court of equity has jurisdiction to enjoin such performances. One of the most recent cases decided by this court on the question of public nuisances and the proper exercise of jurisdiction by a court of equity to enjoin such

a nuisance is that of *Gullatt* v. *State,* 169 *Ga.* 538 (150 S. E. 825). In rendering the decision of the court in that case Mr. Justice Hines said: "'A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effect on individuals.' Civil Code (1910), § 4454. Under this definition the maintenance of a gaming-house or a gaming-place is a public nuisance. . . A court of equity has jurisdiction, and in a proper case will by injunction restrain a public nuisance. 'Equity, generally, will not interfere with the administration of the criminal law. The State, however, has an interest in the welfare, peace, and good order of its citizens and communities, and has provided in its laws for the abatement of nuisances when the public generally is injured.' *Lofton* v. *Collins,* 117 *Ga.* 434, 440 (43 S. E. 708, 61 L. R. A. 150). Generally a public nuisance gives to any individual no right of action for injunction, but it must be abated by a process instituted in the name of the State. Civil Code (1910), § 5330. By clear and necessary implication injunction will lie in the name of the State to enjoin such a nuisance. Even before the adoption of our first code this court held that a court of equity has jurisdiction, and in a proper case may by injunction restrain a public nuisance upon information filed by the solicitor-general. *Mayor &c. of Columbus* v. *Jaques,* 30 *Ga.* 506." In *Dispensary Commissioners of Lee County* v. *Hooper,* 128 *Ga.* 99(3) (56 S. E. 997), Judge Cobb, delivering the opinion of the court, said that the illegal sale of intoxicating liquor might be abated as a public nuisance affecting the whole community in which the sale is carried on, and that: "The sale was illegal. Being illegal, it was a public nuisance, and a court of equity, at the instance of the State, in a proceeding filed by the solicitor-general, had jurisdiction to enjoin its further continuance." In *City Council of Augusta* v. *Reynolds,* 122 *Ga.* 754 (50 S. E. 998, 69 L. R. A. 564, 106 Am. St. R. 147), it was held that a court of equity had jurisdiction, at the instance of the solicitor-general, to restrain by injunction the erection of a public nuisance; the nuisance in that case being the erection of a carnival upon one of the public streets of Augusta and which obstructed the same.

Plaintiffs in error rely upon the case of *Dean* v. *State,* 151 *Ga.* 371 (106 S. E. 792, 40 A. L. R. 1132). That case is distinguishable from the case at bar. There the judgment of the trial court

was reversed because it was held that the defendant engaged in the profession of a chiropractor without obtaining a license, and injunction was based solely upon this ground. In that case Mr. Justice George, delivering the opinion of the court, said: "The chancellor did not pass upon any issue of fact raised by the pleadings. . . The chancellor did not find that the practice of plaintiff in error's profession worked hurt, inconvenience, or damage to any particular person or to the public or to any particular part of the public. . . The chancellor has refused to find in this case (even if it be conceded that he was authorized so to find) that the treatment of persons according to the chiropractic method, as practiced by plaintiff in error, was harmful to his patients, or to any part of the public, or to the public generally as noted above." In the present case the trial judge did, in his order granting the injunction, pass upon the facts and certified in the bill of exceptions (although the court refused to base his opinion solely upon this ground, as will be seen on page 15 of subparagraph (b) of the bill of exceptions) that the acts of the defendants constituted a *public nuisance,* because those acts did constitute a public and continuous violation of the law against working on Sunday. In the instant case, the acts alleged against the defendants constitute a violation of the Penal Code (1910), § 416; and those acts, being continuous, and happening on every Sunday in an open, public, and notorious manner, constitute a public nuisance. If the continuous violation of the section of the Penal Code openly and flagrantly on each Sabbath day, which was designed as a day of rest and cessation from labor and which affords "the opportunity to build character, health, cleanliness and happiness," does not affect the public and the citizens and taxpayers of the community generally, then it is difficult to see how anything could so affect a community. And this law against using the Sabbath day to carry on one's daily vocation, being based upon good sound reason and common sense, is not rendered invalid, because it conforms to the moral law, which enjoins us to "Remember the Sabbath day to keep it holy. Six days shalt thou labor, and do all thy work; but the seventh day is the Sabbath of the Lord thy God; in it thou shalt not do any work, thou, nor thy son, nor thy daughter, thy manservant, nor thy cattle, nor thy stranger that is within thy gates." Exodus 20 : 8, 9, 10.

It is argued that a court of equity has no jurisdiction in a case like the present, for the reason that the law provides an ample remedy for a violation of section 416 of the Penal Code, by criminal prosecution. But it is alleged in the petition that the defendants in this case are prominent people (which fact is a legitimate consideration for the court: *Mayor and Council of Columbus* v. *Jaques,* 30 *Ga.* 506(3), 512, 513), and that in all probability, for that reason, they might not be convicted. Whether this is a sound reason for coming into equity it is not necessary to decide, but the public is entitled to the most effective way to prevent the violation of its statute; and if a court of equity will prevent a multiplicity of suits and effect a more speedy determination of these cases and prevent a continuation of these violations, as defendants threaten, then a court of equity would have jurisdiction to put a speedy termination to such violation of law. By such threatened continuation of the violation of the statute the authority of the State is openly challenged, and, if persisted in, will encourage the breaking down of constituted authority, and succeed in destroying such authority, and the security of the citizens. In *Georgia R. &c. Co.* v. *Maddox,* 116 *Ga.* 64 (42 S. E. 315), this court, in modifying the judgment of the trial court restraining the operation of freight-trains in the City of Atlanta, both on week days and on Sundays, held that the injunction granted in that case was too sweeping, because the court enjoined the carrying on of a lawful business in the week days as well as on Sundays, and did not attempt to enjoin only the commission of act of running freight-trains on Sunday. In delivering the opinion of the court in that case, Mr. Justice Fish said: "As to the inconveniences, annoyances, and disturbances complained of as a continuing nuisance resulting from the operation of the terminal yard on Sundays, and forming the fourth excepted instance hereinbefore specified, we think the plaintiffs' case is sustained by the facts and the law. Sunday is not an ordinary working day. It is 'a day observed by the Christian world as holy, and set apart for the purpose of rest and worship.' 24 Am. & Eng. Enc. L. (1st ed.) 528-9. This is, in part, shown by the interdiction put by the statute upon the starting of freight-trains in this State after 12 o'clock midnight on Saturdays, or the arrival of such trains at their destination after 8 o'clock a. m. on Sundays, that had been started at a proper time, excepting

freight-trains of live stock, fruit, vegetables, and other perishable articles. Penal Code, § 420. It has been held that a railroad company is not bound to carry passengers or freight on Sunday, even when a statute permits it to do so; and if it contracts to do so, and afterwards fails to carry out the contract, it is not an infraction of the company's general duty as a common carrier. . . In no part of the evidence for the railroad companies is it stated that such work on Sundays is a necessity, except, as above mentioned, 'occasionally.' The evidence, then, shows that such work is carried on on Sundays, more as a matter of convenience to the railroad companies than of necessity, and therefore is done unnecessarily. The exception usually made in favor of works of necessity on Sundays does not embrace work which is merely convenient, but not necessary. . . See also Village of Pine City *v.* Munch [42 Minn. 342, 44 N. W. 197], 6 L. R. A. 763. The remedy for this objectionable feature, so far as the defendants in error are concerned, is to enjoin that, and nothing else, which is the procedure adopted by this court in the case of *Hill* v. *McBurney Oil & Fertilizer Co.*, 112 Ga. 788 [38 S. E. 42, 52 L. R. A. 398], where only the unnecessary blowing of the factory whistle was restrained." It seems to me that the operation of a picture-show on Sunday in violation of section 416 of the Penal Code, and the continuous violation of it in an *open* and *flagrant manner,* with the statement that such violation is to continue, gives the public the right to the most effective remedy in order to prevent it, and that remedy is by injunction, and that the acts complained of constitute a public nuisance.

But it is argued that resort should have been had to the mayor and city council to abate the nuisance complained of, if one exists, rather than a resort to a court of equity. It will be noted that each Sunday performance gives rise to a new cause of action, and the nuisance is a continuing one; and this court, in the case of *Town of Rentz* v. *Roach,* 154 *Ga.* 492 (5) (115 S. E. 94), held that "A continuing nuisance gives a new cause of action for each day of its continued maintenance. *Butler* v. *Thomasville,* 74 *Ga.* 570; *Georgia Chemical & Mining Co.* v. *Colquitt,* 72 *Ga.* 172; Civil Code (1910), § 4459; *Mulligan* v. *Augusta,* 115 *Ga.* 337 (41 S. E. 604) ; *City of Atlanta* v. *Warnock,* 91 *Ga.* 210 (18 S. E. 135, 23 L. R. A. 301, 44 Am. St. R. 17). And in such a case, in order to avoid a multiplicity of suits, a court of equity will enter-

tain jurisdiction to enjoin the nuisance and also to have it abated. *Mayor &c. of Waycross* v. *Houk,* 113 *Ga.* 963 (39 S. E. 577). In such a case the statutory provision, as embraced in the Civil Code (1910), §§ 5329, 5331, does not afford an adequate remedy at law; and equity, having assumed jurisdiction, will grant full relief." Of course, the proper operation of a picture-show during the week is not unlawful, but its operation on Sunday, under the circumstances of this case, is unlawful. The defendants in their answer admit that they expect to continue the Sunday operations, and injunction is necessary in order to prevent this continuous illegal operation. See *Spencer* v. *Tumlin,* 155 *Ga.* 341 (116 S. E. 600). If defendants can operate this picture-house every Sunday, what would prevent every business house in Albany, including pool-rooms, livery-stables, garages, etc., to open their places of business, keep the same employees, pay them the same salaries, and under the pretence of giving the net proceeds to some charitable organization, and thereby violate openly section 416 of the Penal Code, if the defendants in this case are permitted to operate their picture-show on Sunday without molestation?

In conclusion, the case seems to stand this way: The State has on its statute books certain laws which prohibit the violation of the Sabbath day, by punishing the violators with a certain penalty. That law, and all of our laws, are made by the people themselves. It is their right to pass legal laws, or, if they see proper, to repeal them. It is not the duty of the courts to make laws, but to interpret and apply them; and until a law is repealed, it is the duty of the citizens to observe it, and to demand that it be enforced. 240 citizens and taxpayers of Dougherty County are asking for the enforcement of the law as contained in the Penal Code, § 416, and the court below has seen fit to grant their request, under the facts in the record, by enforcing that section, where it is made to appear that it is being continuously violated; and in view of all the pleadings in the case, the evidence, and the law bearing on it, I feel constrained to concur in the judgment of the trial court, in granting the injunction against the continued violation of the Penal Code, § 416, and in preventing defendants from operating the picture-show in question on the Sabbath day, in violation of the plain terms of the statute.

ON MOTION FOR REHEARING.

The plaintiff in error asks for a rehearing in this case, for the following reasons:

"(1)  The present opinion is based on the idea (syllabus 1-*a*) that (a) the Theatre Company itself operates the picture-show, and (b) sells tickets to the patrons, and (c), 'turns over' to the Legion's charities the net proceeds, after paying the expenses; and the member or members of this court concurring in said opinion have overlooked the undisputed fact in the record that (a) it is the American Legion that operates the picture-show on Sunday (and not the theatre company) and (b) that no tickets are sold (but on the contrary said proceeds belong to the Legion's charities from the moment when they are given). The great importance of this error in the present opinion appears when we consider the next paragraph (numbered 2) below.

"(2)  The present opinion overlooks and fails even to mention the first point (and the point most strongly urged by plaintiff in error, supported by the most numerous authorities, on pages 29 to 42 of our original brief), viz.: That since the record shows (and even the present opinion admits this) that the picture-show is being operated by the American Legion, it follows that the lawfulness of the acts of the employees operating said picture-show must be determined and decided according as the acts of the employer were lawful or unlawful;—in other words, the agent (employee)' can not be guilty unless the principal (American Legion)' is guilty,—this point having already been ruled expressly in favor of plaintiff in error, in New York, Massachusetts, Maine, South Carolina, and other States, without any decision anywhere to the contrary, and having been also ruled (by necessary implication) in favor of plaintiffs in error, even in Georgia.

"(3)  The logical result of the present opinion is that every paid choir-singer, organist, or sexton of a church in the State of Georgia violates the Sunday law, every Sunday. If the lawfulness of the employer's acts (the church's) do not protect these, then nothing can protect them. Every argument used in the present opinion, against the lawfulness of the acts of the employees of the American Legion, applies with equal force against the acts of such employees of churches.

"On the question as to whether or not the picture-show constituted a nuisance which could be enjoined by a court of equity:

"(1) Every word of the present opinion on this subject is fully answered by, and directly contrary to, the ruling of the Supreme Court in the *Dean* case (151 *Ga.* 371(2), 373, 375 [supra], opinion by Justice George), and also in the case of *Bentley* v. *State Board of Examiners* (152 *Ga.* 836, 841 near top [111 S. E. 379], opinion by Justice Hines); and also in the case of *Bennett* v. *Bennett* (161 *Ga.* 936, 942 top half [132 S. E. 528], opinion by Justice Beck). For certainly in all of those cases the acts of the defendants which were sought to be enjoined were (a) fully as public and notorious as they were in this case, and (b) fully as continuous as in this case, and (c) far more certainly criminal, than in this case. It is the resolution of the court (in the 2d headnote in the *Dean* case), adopted without dissent, which is controlling and not the individual expressions of Justice George (though even they are in entire harmony with the resolution of the court,— and especially so are his expressions on pages 373 and 375, about the necessity of an act of the legislature declaring a crime to be a nuisance, before it can be enjoined, unless it was a nuisance at common law, as in the case of a gaming-house). The contention of the present opinion, to the effect that the *Dean* case is distinguishable from the case at bar, is based upon an entirely erroneous conception of the record in this case, as shown in the next paragraph.

"(2) The present opinion is egregiously in error in saying that the trial judge, in this case, found the acts of the defendants to be a nuisance 'because those acts did constitute a public and continuous violation of the law against working on Sunday.' The fatal error in this statement is the incorporation of the words 'against working' therein. What the trial judge did hold (and he so certified in the record) was that said acts of the defendants were a nuisance, (a) 'because those acts did constitute a public and continuous violation of the law' (this regardless of what particular law was being violated), and (b) that said violation occurred 'on Sunday' (that is, at a time when the people are supposed to be in an especially moral mood, and therefore should not be disturbed by seeing any law violated 'publicly and continuously'). So the truth appears, that, in this case, the trial judge based his right to enjoin solely upon the ground that the acts sought to be enjoined (a) were unlawful (regardless of what law was being violated), and (b) occurred on 'Sunday' (at a time when the violation might be

considered more 'flagrant,' than on any other day). The trial judge did not certify that he found the acts of the defendants to constitute a nuisance because the 'character, health, cleanliness, or happiness' of the public was affected in the slightest degree.

"(3) The present opinion inextricably confuses and commingles two separate things, to wit, (1) the effect of the defendants' acts upon the defendants' employees, on the one hand; and (2) the effect of such acts on the public generally, on the other hand. Even in the case of a real public nuisance, it is the latter only which is entitled to any consideration.

"(4) The present opinion inextricably commingles and confuses the legal authorities bearing on two separate things, to wit, (1) those bearing on a suit by private individuals, to enjoin a private nuisance, and protect property rights, on the one hand,— and those bearing on a suit in the name of the State to enjoin a public nuisance, on the other hand."

In the original opinion filed by the writer, he did not set out all of the facts in the record, because to have done so would have made the report unduly long, but every part of the record was carefully examined; and after a review of the entire record, including the petition, amended petition, the intervention of the American Legion, the answers of the defendants, and the evidence in the case, including the motion for rehearing, I am unable to reach a different conclusion from that arrived at in the original opinion. One or two important features of the evidence in the case were omitted in the original opinion, and will be set out here. For instance, on page 13 of the record is the following advertisement by the Albany Theatre as to one of the pictures *exhibited on Sunday,* November 3, to wit: "With the Sunday opening to-morrow, Nov. 3rd, all Sunday performances will be under the auspices of the American Legion. Albany Theatre, Sunday, Mon., Tues. Show Boat. Sunday—Monday—Tuesday. Southwest Georgia's Magnificent Theatre presents Edna Ferber's great story of young love, screened in such magnificent manner as to make you catch your breath. Imagine the color of life aboard a show boat—of yearning hearts separated by circumstances that actually brought them together. Yes, in each other's arms, but worlds apart! What drama! Never before anything like it on the stage or screen. Carl Laemmle's picture magnificent, played by Laura La Plante,

Joseph Schildkraut, Otis Harlan, Alma Rubens, Emily Fitzroy, Jane La Verne, and hundreds of others. Don't miss it. Hear the Zeigfeld stars singing the songs that made them famous. Hear Helen Morgan sing 'Bill,' Jules Bledsoe and the Jubilee Singers sing 'Ol Man River,' Aunt Jemima and the Plantation Chorus sing 'Hey Feller.' Hear 'Can't Help Lovin' That Man,' 'Make Believe,' 'Why Do I Love You' and other Ziegfeld hits you'll never forget. Added attraction: Hugo Reisenfeld and his orchestra of 100 pieces. Sunday performances at 1:30 to 6:16 in the afternoon, and one night performance starting at 9:00. *Admission 50¢ at all Sunday showings.''* (Italics ours.)

It is true that defendants say that the statement ''admission 50¢ at all Sunday showings'' was omitted from subsequent advertisements, but this advertisement was sufficient to authorize the court to hold that admission fees were charged by the defendants to at least one of the shows put on at the Albany Theatre. In the bill of exceptions complaint is made in paragraph (b) that ''the court erred in granting said injunction, for the reason that, independently of all other points, the plaintiff in said case failed to show (defendants and each of them contend) that the acts of the defendants complained of constitute a public nuisance, such as could be enjoined by a court of equity; and it is here recited as a matter of fact, and certified by said judge, that *said judge did find said acts of the defendants to constitute a public* nuisance, *because said acts did constitute a public and continuously* recurring violation of the law on Sunday.'' (Italics ours.) The brief of counsel for plaintiffs in error states: ''Thus it distinctly appears in this record that the trial judge did *not* find from the *evidence* that there was *anything* about the acts of the defendants (plaintiffs in error) which *did* constitute them a *nuisance,* except and unless the *mere* fact that said acts constituted 'public and continuously recurring *crimes,* would under the law necessarily result in their *being* a *nuisance* which equity would enjoin,' in other words the *decision* in the case at bar is *based* upon the *legal proposition* that *any* 'public and continuously recurring' *crime* may be enjoined by equity. We take sharp issue with our opponents upon *this last* proposition, as well as upon the proposition that the acts of plaintiffs in error do *really* constitute 'crimes' at all.'' So, the present contention of the plaintiffs in error, that the court below did not pass upon ques-

tions of fact to the effect that acts of the defendants did constitute a public nuisance, is contradicted by the bill of exceptions itself, and a careful reading of the authorities cited in the original opinion, and of the entire record in this case, will show that such acts under the law did constitute a public nuisance.

As to the question of whether entrance fees to the theatre was a *charge,* or was voluntary, the petition alleges: That said "picture-show was operated under the same license issued by the City of Albany to said defendants aforesaid, and the same license paid as an occupation tax in said State and County, on each and all of the stated dates. That said pictures were furnished under the same contract for pictures as hereinbefore alleged. That said performances were all held at the same place and the usual advertisements, and the same advertising contract with Herald Publishing Company as aforesaid. That the same prices prevailed at each and all of said performances. That said performances were operated under the same lease of the building by the owners to the said operators of the Albany Theatre, and the said defendants, owners aforesaid, are hereby notified and required to have and produce the original lease contract upon the trial of this case, the same to be used as evidence on behalf of the plaintiffs, pertinent and material to the cause in question." The contract between the Albany Theatre and the exhibitor was produced, and provided: "The exhibitor warrants and agrees that during the period each of the photo plays herein provided for shall be exhibited in said theater *the exhibitor will charge for admission to said theatre* [italics ours] an actual admission fee which shall not be less than 10 cents, unless a greater minimum admission charge is herein elsewhere specified, for each exhibition, and that such photo plays shall not be exhibited unless such admission fee is charged." So, it will be seen that the contract contemplated that an admission fee should be charged for the showing of each of the "photo plays." The allegations of the petition were verified by quite a number of citizens of Albany; and the court was authorized to find from the pleadings and the evidence that the acts complained of did constitute an open, continuous violation of law, and was *a public nuisance,* and to enjoin the defendants from showing the moving pictures on Sunday; and construing the order of the court in connection with the allegations of the petition, a part of which are

set out above, and in connection with the evidence in the case, I think that the court's order, properly construed, means that he was passing upon the question of fact; that the acts complained of did constitute a *publilc nuisance;* and, as held repeatedly by this and other courts, a public nuisance can be enjoined by a court of equity. *Dean* v. *State,* supra, *Walker* v. *McNelly,* 121 *Ga.* 114, 115 (48 S. E. 718). The *Dean* case, and similar authorities, are cited in the brief of plaintiffs in error, and on motion for rehearing they complain that such authorities are in favor of plaintiffs in error. As pointed out in my original opinion, these cases are not controlling.

And it is contended that the acts complained of did not work injury, damage, or hurt to the public, as provided by law. This record shows that there were resolutions adopted against exhibiting these Sunday shows by a number, if not all, of the Protestant churches in Albany, and certain nearby towns, and that it was alleged that the showing of these pictures on Sunday was dividing the community into factions, and causing factional strife. What greater hurt or injury can come to a community than that, I am unable to perceive. I endeavored to point out the original opinion that the showing of these pictures on Sunday under the auspices of the American Legion was not entirely free of charge, for the reason that the same persons were operating the picture-show who performed that service on week days for the Albany Theatre, and that they received the same pay, and that the pro rata cost of the films, rent charges, advertising, and all the costs, came out of the receipts from the exhibition of the pictures; and this being so, I do not see how it can be said that the exhibition of these pictures was absolutely free, and was a work of charity. It is contended by the plaintiffs in error that the employees who operated the picture-show were employees of the American Legion, and not of the Albany Theatre Company, and therefore, under the law, unless the Albany Theatre Company were guilty of a violation of the Penal Code of 1910, § 416, the agents, the employees of the Legion, were not guilty. But it will be borne in mind that the violation of section 416 of the Penal Code of 1910 is a misdemeanor, and in misdemeanor cases *all are principals* (*Kinnebrew* v. *State,* 80 *Ga.* 232, 5 S. E. 56; *Jackson* v. *State,* 154 *Ga.* 544, 114 S. E. 811); and therefore, where it appears that all of the defendants, including

the paid employees, and the American Legion, had some part in putting on the shows on Sunday, in violation of law, all were equally amenable to section 416 of the Penal Code 1910. Those who think that the laws of Georgia are too stringent and not sufficiently modern should appeal to the legislative branch of the government, which enacted the present law.